Matter of the Application of Laurence G. BODKIN and Mary D. Bodkin for an order declaring unreasonable, illegal and void, a certain search and seizure, etc.

No. 2162.

United States District Court
E. D. New York.
Aug. 21, 1958.

26

Corcoran, Kostelanetz & Gladstone, by Boris Kostelanetz, New York City, and Jules Ritholz, New York City, of counsel, for petitioners.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., by Morton Schlossberg, Asst. U. S. Atty., Brooklyn, N. Y., for the United States.

RAYFIEL, District Judge.

The petitioners moved under Rule 41 (e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., for an order, (1) declaring illegal and void the search and seizure of certain books, records, memoranda, etc., belonging to them, (2) directing the return thereof, (3) suppressing and restraining the use of the same before a grand jury or at a trial, and (4) directing that a hearing be held and evidence adduced respecting the issues raised thereby.

Prior to the argument of said motion the petitioners had sought, under Rule 26 of the Federal Rules of Civil Procedure, 28 U.S.C.A., to take the depositions of several employees of the Internal Revenue Service, and, in connection therewith, to inspect certain letters, documents and memoranda in the possession or control of said Service, for the purpose of obtaining information to support their application for said order. Claiming that agents of the Service had deliberately and wilfully refused to answer certain questions during the course of the depositions, and to make available for inspection certain letters, documents and memoranda, despite an order of Judge Abruzzo directing them so to do, the petitioners moved under Rule 37 of said Civil Rules for an order striking the affidavits submitted in opposition to their motion under Rule 41(c) herein.

Chiefly because of the sharp conflict in, and the complex nature of, the facts set forth in the affidavits, and the further fact that the said depositions, though quite extensive, had not yet been completed, I directed that a hearing be held of the issues raised by the motion to suppress, thereby affording the petitioners an opportunity to complete the examination of the Government agents whose depositions had been taken only in part. The hearings were very extensive, the transcript thereof being upwards of 1000 pages in length, and numerous exhibits were received in evidence. That course rendered the motion under Rule 37 moot.

The petitioners base their claim for relief chiefly on the fact that Government agents, by using fraud, misrepresentations and deceit in obtaining evidence incriminating them, had violated their

rights under the Fourth and Fifth Amendments of the Constitution. More specifically, they contend, *inter alia,* that in or about September, 1954 one Carver, the head of the so-called Fraud Squad in the Brooklyn office of the Internal Revenue Service, as the result of an investigation made by a member of his staff, had obtained certain information concerning the amount and source of part of the income of the petitioner, Laurence G. Bodkin, and then set in motion a fraud investigation of the petitioners' joint returns; that instead of choosing an experienced member of his own squad for that task, Carver, hoping thereby to deceive and mislead the petitioners, selected an "innocent-appearing" Revenue Agent, one Seftel, whose usual duties consisted chiefly of routine audits of taxpayers' books and records, directing him, however, to clear all reports as to his findings through the Chief of the Fraud Section; that the "innocent-appearing" Seftel, by the subtle exercise of guile and craft, and by assurances that the petitioners would be spared criminal prosecution if they would co-operate in his inspection and examination of their books, records and tax returns, succeeded in obtaining from them, in violation of their constitutional rights, certain information and evidence which they seek here to suppress.

The petitioners further claim that in May and September, 1955, respectively, during the period in which the petitioners' books and records were under examination by Seftel, Special Agents Unger and Kelly, of the Intelligence Unit of said Service, which is charged with the preparation of cases for criminal prosecution, entered the case, and that thereafter Seftel, acting under Unger's direction and instructions, proceeded to seek and obtain information from and concerning the petitioners. Briefly and rather generally stated, those claims constitute the gravamen of petitioners' charges.

The facts, as I find them, follow. In September, 1954, Carver, head of the so-called Fraud Squad of the Brooklyn Office of the Internal Revenue Service, obtained through the public press information respecting the amount of income received during 1953 by a number of physicians, including the petitioner, Laurence G. Bodkin from United Medical Service. (S.M.P. 945.) In October, 1954, Carver directed several of his subordinates to audit the returns of the physicians named in the news item. Seftel was designated to audit the returns of the petitioners. For reasons not here relevant he was unable to comply with the directive until February 1, 1955, when he telephoned the petitioner, Laurence G. Bodkin, and made an appointment to meet him at the office of the Director of Internal Revenue in Brooklyn on February 24, 1955. At the request of Mrs. Bodkin the date of the meeting was advanced to February 3rd, and the place changed to the home of the petitioners, where certain books and records were made available to Seftel, who then and there commenced his audit.

After a somewhat cursory examination of the records in the presence of Mrs. Bodkin, Seftel informed her that they were incomplete and in a confused state, and requested certain additional information which she promised to furnish. Mrs. Bodkin then admitted that the petitioners may have failed to report some part of their income, and suggested that their disclosure thereof might help mitigate the penalty therefor. Seftel informed her that he had no authority in the matter, but that he would report to his superiors the fact and the extent of the petitioners' co-operation. When apprised of the confused state of their records she asked whether it would be advisable for the petitioners to engage someone to represent them in the matter, and he suggested that the services of an accountant would be helpful. The petitioners claim that when they then inquired whether they ought to engage an attorney Seftel "vehemently and urgently directed them" not to do so. They point to that fact as but another overt act in Seftel's insidious plot, under Carver's direction, to obtain information and

evidence for the criminal prosecution of the petitioners by lulling them into a feeling of security with promises that a complete disclosure would result in a prompt settlement of their tax problems. In view of the petitioners' charge that Carver was engaged in an insidious plot to obtain information and evidence for criminal prosecution, it would be well to state at this point that that was not Carver's function, or that of the Fraud Squad. It is the function of the Intelligence Unit and its Special Agents, and theirs alone. As Carver stated (S.M.P. 943), his contact with the Intelligence Unit arose only when a member of his Squad discovered evidence of fraud, in which event he referred the matter to that Unit. I found nothing in the testimony of the petitioners at the hearing to justify the claim, made in their behalf, that Seftel had made "exquisitely detailed efforts * * * to prevent the engagement (by them) of an attorney who might pierce the veil of deception." I do believe that he suggested that the retention of an accountant would be preferable, but that was probably occasioned by the "confused" condition of the petitioners' books and records.

After the meeting of February 3rd there followed a period of relative inactivity by Seftel until about April 4, 1955, when he received a telephone call from a Mr. McNamara, a member of the firm of Haskins and Sells, certified public accountants, informing him of the fact that he had been retained by the petitioners, and suggesting that Seftel meet him at his firm's offices on May 3, 1955. On that date the books and records of the petitioners, then in the care, custody and control of Mr. McNamara, were made available to Seftel, who continued his examination thereof, commenced as aforementioned, on February 3rd. On May 11th, and again on May 26th, Seftel appeared at the office of Haskins and Sells, where he resumed his examination of said books and records, on both occasions, as on May 3rd, with the knowledge and consent, and frequently in the presence, of Mr. McNamara.

According to the record, Seftel's activities up to this point, that is, May 26th, unlike his participation hereinafter referred to, were of a solo nature. He was, in my opinion, engaged in making a routine audit, besides carrying out Carver's aforementioned directive respecting the alleged income reportedly received by the petitioner, Laurence G. Bodkin, from the United Medical Service. He was working alone, and apparently without additional specific instructions. The claim of the petitioners that they were beguiled into making the disclosures sought here to be suppressed by Seftel's craft and cunning is not supported by the evidence. I am convinced that he did not possess the subtlety and wile necessary to accomplish such a purpose. The petitioners are very intelligent and educated persons, while Seftel had limited experience as a Revenue Agent and, based on his demeanor as a witness and his testimony, was a rather artless and ingenuous individual. The record, in so far as it relates to his activities during the period ending May 26th, fails to support the petitioners' contention that Seftel infringed upon their constitutional rights by obtaining, through false promises or assurances or other devious means, information and evidence for use in a criminal prosecution. The petitioners do not question the right of the Government to examine their books and records for the purpose of auditing their tax returns. Section 7203 of Title 26, U.S.Code. It is my opinion that up to and including May 26th Seftel was conducting a routine audit, and none of the information or evidence obtained to that date is tainted with illegality. I am satisfied that that information was given or made available to him voluntarily in the hope, and not on the promise, that the petitioners' tax problems would be resolved without a criminal prosecution.

After May 26th, however, Seftel's activities in the investigation changed. In mid-May he reported that he had found substantial understatement of income in the petitioners' tax returns

for the years 1951, 1952 and 1953, and suggested that the matter be referred to the Intelligence Unit of the Service, which is charged with the investigation and preparation of cases for criminal prosecution. Max Unger, a Special Agent of the Unit, was assigned to the case. He requested Seftel to meet him at the office of the Intelligence Unit on May 31st, when they discussed the case.

Thereafter Seftel no longer audited the petitioners' tax returns, for on most, if not all, of his subsequent visits to Haskins and Sells—there were some fifteen of such visits—he worked under the direction of Unger, receiving general instructions from him to continue his examination of the books and records, and, in several instances special instructions to obtain certain specified information or copy specific items, and in one case to bring records to his office for photostatting. On at least two of such occasions Seftel was joined at the office of Haskins and Sells by one Kelly, also a Special Agent attached to the Intelligence Unit, who worked with him on the petitioners' books and records.

It is true that on all such occasions the said books and records were examined in the office of Haskins and Sells, and with the knowledge and consent, and frequently in the presence, of Mr. McNamara, a certified public accountant of vast experience, who had specialized in tax practice for some thirty years. It is likewise true that McNamara was the petitioners' agent and that his knowledge and consent would ordinarily be imputed to them. But during all the period commencing with May 26th and continuing until October 14th, McNamara did not know that a Special Agent had entered the case, and that preparations were being made for a criminal prosecution. Hence, McNamara's, and consequently the petitioners', consents cannot be said to have been "voluntarily and understandingly given". Turner v. United States, 4 Cir., 222 F.2d 926, 931. Because of his extensive experience, I find it difficult to believe that McNamara, had he known that a Special Agent was working on the case on May 31st, would have permitted Seftel to continue his examination of the records after that date. Nor would he have co-operated in other ways to the full extent the record indicates he did. Accordingly, while disagreeing with the petitioners' claims that Seftel was guilty of the conduct so vividly and reproachfully characterized or described by them, I am obliged to conclude that the information and evidence obtained by the Government through the examination by its agents of the petitioners' books and records between May 31st and October 14th, being the product of involuntary disclosures induced or procured by the furtive and surreptitious actions of the Special Agents, are tainted with illegality, and should be suppressed, as likewise should all evidence secured solely from leads obtained thereby.

But that does not apply to the evidence obtained from said records after October 14th. True, Seftel, in his subsequent work on the records, continued to follow the instructions and orders of Unger, but no stealth or deception is imputable thereto, since by October 14th McNamara had learned that a Special Agent (Unger) had entered the case. In all probability he permitted examinations thereafter because the disclosures and discoveries made between May 31st and October 14th constituted a *fait accompli*, and, further, because he hoped that by continued co-operation a settlement could be effected. In any event, no claim was made by the petitioners that McNamara permitted the continuance of such examinations after October 14th without their knowledge and consent, or against their wishes. It may be assumed that he informed the petitioners that a Special Agent was in the case, but, even if he failed to do so, his knowledge, as their agent, is imputable to them. The fact is, however, that not long thereafter—early in December—the petitioners and their representatives conferred with Unger, after which, on several occasions, Seftel continued his examination of the petitioners' records. One of

their representatives at the said conference was Howard Seitz, Esq., who had been retained by them in November to act as their counsel. Seftel worked on the petitioners' records on at least ten occasions after October 14th, at least five of such examinations being conducted after they had retained Mr. Seitz, and after the aforementioned conference. All of such examinations were made at the office of Haskins and Sells, and, as was the case in the May 3rd examination hereinbefore referred to, were conducted with the knowledge and consent, and frequently in the presence, of McNamara.

■ I have given careful consideration to the petitioners' contention that "the spoliation of documentary evidence by Revenue Agent Seftel puts his entire testimony under grave shadow". If it were true spoliation their point would merit attention. "Spoliation" is the destruction, or the significant and meaningful alteration, of a document. What Seftel did was to interline, or otherwise add, entries in his diary of acts or events in the case a number of days after they had occurred. While there would appear to be implications of impropriety or irregularity because of the manner in which the entries were added, I doubt that Seftel had a sinister motive in so doing. It appears certain that he did not make the interlineations and other additions in preparation for the hearing, as the petitioners contend, for Seftel's diary was of no evidentiary value to the Government, and it was virtually inevitable that on cross-examination petitioners' able counsel would request that the diary be made available for inspection, and the palpably added and interlined entries brought to light. Incidentally, the crude manner in which the belated entries were made hardly bespeak the craft and guile of which the petitioners accuse him. The petitioners have failed to sustain their burden of proving that the evidence obtained prior to May 31st and subsequent to October 14th was acquired in contravention of their consti-

tutional rights. Wilson v. United States, 10 Cir., 218 F.2d 754.

In sum, then, it is my opinion that the evidence acquired by Seftel prior to May 31st was obtained as a result of a routine audit of the petitioners' records, and without promises or assurances of any kind or nature; that the evidence acquired by Seftel or others in behalf of the Government between May 31st, the date of his conference with Unger, and October 14th, on which date McNamara had learned of the entry of a Special Agent into the case, obtained, as it undoubtedly was, upon the specific orders and directions of Unger for varied explicit information, and without the knowledge and the understandingly-given consent of the petitioners, is tainted with illegality; and that the evidence acquired after October 14th was voluntarily given by McNamara, and consequently by the petitioners, with knowledge that Special Agents of the Intelligence Unit were participating in the investigation. United States v. Burdick, 3 Cir., 214 F.2d 768; Montgomery v. United States, 5 Cir., 203 F.2d 887; and numerous other cases. It should be noted, further, that after November 30th the petitioners had the advice also of able counsel.

The hearing failed to disclose with particularity the items of information and evidence which were obtained within the proscribed period, to wit, between May 31st and October 14th, so that the tainted evidence cannot be described here with adequate specificity. The matters herein involved have not yet been presented to a Grand Jury. If an indictment should be returned, questions involving some of the items of evidence may be resolved at the trial. It should be noted, however, that Seftel claimed that early in May, some two weeks before his first conference with Unger, he found evidence of substantial understatement of income by the petitioners for the years 1951 to 1953, inclusive.

Seftel's diary will be helpful in the identification of many of the items of

evidence obtained by him during the course of his examination of the petitioners' records, as well as the specific dates when they were obtained. The diary should be produced at the trial.

Accordingly, the petitioners' motion is granted to the extent only that all evidence obtained by the Government through the examination of the petitioners' books and records between May 31, 1955 and October 14, 1955, as well as all evidence derived or acquired therefrom, will be suppressed; in all other respects the motion is denied.