I. C. **TURNER** and E. V. Turner,
Appellants,

v.

**UNITED STATES** of America,
Appellee.

No. 6954.

United States Court of Appeals
Fourth Circuit.

Argued April 12, 1955.

Decided May 23, 1955.

Arthur O. Cooke, Greensboro, N. C., and H. F. Seawell, Jr., Carthage, N. C. (C. C. Frazier, Sr., Frazier & Frazier, and Cooke & Cooke, Greensboro, N. C., on the brief), for appellants.

Dickinson Thatcher, Sp. Asst. to the Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, John H. Mitchell, Joseph M. Howard and Kinsey T. James, Sp. Assts. to the Atty. Gen., and Edwin M. Stanley, U. S. Atty., Greensboro, N. C., on the brief, for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

During the years 1946 to 1950, E. V. Turner and I. C. Turner, who were brothers and equal partners, carried on the business of designing, fabricating and erecting outdoor advertising signs at Greensboro, North Carolina, under the name of Turner Sign Company. Their operations extended to North and South Carolina, Georgia, Virginia and the District of Columbia. In 1953 each of the partners was separately indicted for wilful attempts to evade and defeat a large part of his own and his wife's federal income tax for the years 1946 to 1950 inclusive, by filing returns in which the amount of their income was fraudulently understated, in violation of § 145(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. The cases were consolidated and after an extended trial at which 129 witnesses were examined and numerous exhibits were presented to the jury, a verdict of guilty was returned as to each defendant on each of the five counts in his indictment. E. V. Turner was sentenced to two years in a reformatory and ordered to pay one-half of the court costs, and I. C. Turner, as to whom the jury recommended mercy, was sentenced to one year in a reformatory and ordered to pay one-half of the court costs.

The Government's case was based largely on evidence which showed a failure by the partners to record the gross receipts of the business on the partnership books, a failure on their part to report correctly the amount of the gross sales on their partnership information return, and a failure to disclose the correct amount of their taxable income and the taxes due by them in their individual tax returns. Thus, for the year 1946 the partners failed to report sales in the amount of $4685.84, and claimed as a deduction purchases which were overstated in the sum of $24,285.15; and for the years 1947, 1948, 1949 and 1950 the sales reported in the partnership return fell short by the sums of $44,932.71, $35,075.-52, $38,773.47 and $21,896.49 respectively. The additional partnership income and the income tax deficiencies of the partners for these years are shown in the following table:

| Year | Additional Partnership Income | Income Tax Deficiencies | |
| | | E. V. Turner | I. C. Turner |
|---|---|---|---|
| 1946 | $ 24,967.87 | $ 3,672.43 | $ 4,030.09 |
| 1947 | 44,016.01 | 8,255.94 | 8,519.29 |
| 1948 | 32,478.01 | 4,860.40 | 4,741.58 |
| 1949 | 38,620.41 | 5,158.50 | 5,071.14 |
| 1950 | 23,287.62 | 2,800.50 | 2,381.26 |
| | $163,369.92 | $24,747.77 | $24,743.36 |

The probative force of the evidence obtained from the taxpayers' records, by which these figures were established, is not challenged. It is conceded in effect that the evidence was sufficient to warrant the submission of the cases to the jury. This appeal is based in large measure on the contention that substantially all of the Government's evidence was inadmissible because it was obtained illegally from the defendants by Government agents under the pretense that only a routine investigation of their tax liability was being made, whereas in fact the agents were seeking evidence on which to base a prosecution for crime.

The salient facts in respect to the investigation are not disputed. It began on July 9, 1951 when Daniel S. Forbes, a special agent of the Intelligence Division of the Internal Revenue Department, went to the main office of the business and identified himself to the two partners and told them that their partnership and individual tax returns had been assigned to him for examination. Investigation by a special agent may or may not lead to a criminal prosecution, and in this case it was Forbes' duty and doubtless his intention to report any delinquencies which he might find to his superiors. He did not give any information on this point to the partners and on cross examination was unable to say whether or not he had told them that he was making a routine "check-up."

After obtaining general information as to the background of the men, Forbes questioned them as to their books and records and was told that they were kept by H. B. Elliott, their bookkeeper; and Elliott was called in and introduced. He was told the nature of the agent's visits and was directed to produce all books and records of the business for the agent to examine. Elliott produced and showed to the agent the books of the business and the sales invoices for the years 1948, 1949 and 1950, which were kept in his office. The sales invoices for the two previous years were kept in a room upstairs. He then took the agent on a tour of the plant and the agent noticed in the plant office in another building a filing cabinet and was told by Elliott upon inquiry that it contained work orders, that is, rough sketches of signs usually showing in each instance the date, the purchaser and the cost. They were filed in alphabetical order and covered the five tax years involved.

Facilities were provided to enable the agent to work in Elliott's office and Elliott departed leaving the agent alone. The agent studied the books and records for some time and then returned to the plant office where the work orders were kept and secured 35 to 40 of them for the year 1950. He listed and checked them against the accounts receivable on the books and discovered that many orders were not shown on the books. He then listed all of the orders for 1950, checked them against the books and found numerous additional unrecorded jobs or work orders. He also discovered numerous sales invoices which were not shown on the books and records. In some instances the unrecorded sales invoices corresponded with the unrecorded work orders, but there were some unrecorded sales invoices for which there were no work orders and some work orders for which there were no sales invoices.

Two weeks later Elliott produced another set of sales invoices for the years 1948, 1949 and 1950, grouped by months, and explained to the agent that these were the invoices he should be using and that the others were the wrong invoices. The agent found that the new lot of invoices corresponded with the books, but they did not account for any of the unrecorded work orders.

Subsequently Forbes was joined in the investigation by Acting Special Agent Ray V. Williams. He was introduced as such to the partners and they were told that he was there to assist in the investigation. Together the agents listed all the work orders for the entire period and checked them against the books and discovered both unrecorded work orders and unrecorded sales invoices for each year. On one occasion Williams discovered Elliott putting old correspondence in the

wastepaper basket and upon examination found that it referred to sales for which no work orders or sales invoices had been found.

During the month of October, 1951, after compiling the information obtained in this way, one or the other of the agents spent three or four weeks in visiting persons who had bought signs from the company so as to ascertain whether the unreported sales had actually been made. At the end of the month the two agents conferred with both partners and presented some of the evidence which they had discovered and told them that a substantial number of unreported sales had been found and asked for an explanation. The partners were told that they need not answer the questions but they were not told that their answers might be used against them in a criminal prosecution. Some items were discussed but the partners did not explain the deficiencies in the records above described. They expressed a desire to cooperate with the agents and permitted them to search their private offices, but no additional information was secured.

After the conference Williams traveled over 8,000 miles between October 1, 1951 and February 1, 1952, in visiting 50 towns in North and South Carolina, and in Virginia and Georgia, and making contact with 160 persons in following up leads from correspondence sales invoices and the work orders in order to ascertain whether the sales had been made. In this way additional sales were found as to which no data had been discovered amongst the papers of the partnership.

Significant evidence of faulty accounting was introduced with respect to specific years. For 1947 the record showed 168 entries of transactions in a certain book of which a large number were omitted from the partnership return. For 1948 the partnership return listed as a deductible expense two items for a heating plant installed in the home of the father of the partners. In 1949 the partners accepted certain electrical household appliances in exchange for signs and, except for small sums of cash used in the transactions, made no record of them on the books of the business; and in the same year a check for $4985.50 was received in payment for a sign but at no time was the amount recorded or reported as a sale. During 1950 the partnership traded signs for automobile passenger cars but the entries were not completely recorded. In 1950 a check for $3400 was received for the installation of a sign, but the check was exchanged for a cashier's check which was delivered to a motor company for an automobile which was listed in the name of Helen C. Turner. The sale was not recorded upon the books or reported in the partnership tax return.

The defendants objected to the admission of the evidence secured from the books of the business and moved to suppress it on the ground that their consent to the examination was fraudulently obtained under the pretext of a routine investigation for civil purposes when, in fact, a criminal prosecution was contemplated. It is said that from the beginning Agent Forbes had a criminal prosecution in mind and by concealing this fact, the Government obtained the information by a false pretense. Appeal is made to the prohibition of the Fourth Amendment against unreasonable searches and seizures and the prohibition of the Fifth Amendment against compelling a defendant in a criminal case to be a witness against himself.

The contention seems to be that revenue agents who secure the consent of a taxpayer to an examination of his books with intent to obtain evidence and use it in a criminal prosecution, are guilty of deceit unless they divulge their purpose, and that the obtaining of information in such a manner violates the Fourth Amendment and its introduction in evidence violates the Fifth Amendment; and even if the examination is begun solely to ascertain the civil liability of the taxpayer and evidence of crime is unearthed, the taxpayer must be warned and given an opportunity to withdraw his consent, or all information subsequently

obtained is inadmissible in a criminal prosecution.

See Redlich, Searches, Seizures and Self Incrimination, 10 Tax Law Review 191. (January, 1955). United States v. Guerrina, D.C.E.D.Pa., 112 F.Supp. 126; Id., D.C., 126 F.Supp. 609.

In our view the facts in the pending case and the applicable rule of law do not justify the appellants' position. The agents made no investigation to which the defendants did not consent. The bookkeeper was orderd by the defendants to show the books and records of the business to the agent; he told the agent in answer to an inquiry that the contents of the filing cabinet in the plant office consisted of work orders, and he then left the agent in possession of the material in the bookkeeper's office. Certainly the bounds of the defendants' consent were not exceeded when the agent took the work orders from the filing cabinet in the other building and examined them. They were in fact the only records of certain transactions which had been retained, and they were subsequently examined at great length by both agents in the bookkeeper's office without any objection on the part of the defendants. They themselves took the stand in their own behalf and made no complaint that they had been surprised or deceived by the agent, and one of them testified that they had never refused to cooperate with the agent with respect to any of the records in the office of the company but had given them access to the whole place.

At no time did the agents bring pressure to bear upon the defendants or conceal their identity or practice any deceit. The evidence is silent as to whether Agent Forbes began the investigation as a routine examination to ascertain the civil liability of the defendants or intended from the beginning to search for evidence of crime. But even if the latter assumption be made, there was no violation of the taxpayer's constitutional rights. The relevant inquiry is always whether the taxpayer freely gives his consent, and as to that there is no dispute in this instance.

It has been expressly held time and again in tax evasion and other criminal cases that it is not essential to the admissibility of statements secured by officers of the law from a defendant that he should be first warned that the information might be used against him in a criminal case, provided that it was voluntarily and understandingly given. United States v. Burdick, 3 Cir., 214 F.2d 768, 773; Montgomery v. United States, 5 Cir., 203 F.2d 887, 892; Lisansky v. United States, 4 Cir., 31 F.2d 846, 851, 67 A.L.R. 67; Hanson v. United States, 8 Cir., 186 F.2d 61, 64; Powers v. United States, 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448; Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090. We are in accord with the comment of the court in United States v. Wolrich, D.C.S.D.N.Y., 119 F.Supp. 538, where a similar situation was presented. The court said, at page 540:

"On the issue of fraud, defendant relies heavily on cases in which law enforcement officials gained entry by masquerading as private citizens. See Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Fraternal Order of Eagles [No. 778] v. United States, 3 Cir., 57 F.2d 93; United States v. Mitchneck, D.C. M.D.Pa., 2 F.Supp. 225. Here, the revenue agent made no attempt to hide his official identity or the official purpose of his business. Surely defendant was aware that, if a 'routine audit' revealed evidence of criminal liability, the agent would not ignore it merely because he was primarily concerned with civil liability. Defendant was apprised of the fact that his books were sought for investigation by an official of the Internal Revenue Bureau. On that understanding, he authorized his accountant to make his books available. I cannot accept defendant's reasoning or that of the court in United States v. Guerrina, D.C.E.D.Pa., 112 F. Supp. 126. A statement that the purpose of an investigation is a 'routine audit' is not the equivalent

of a promise that only civil liability will be considered regardless of what the examination reveals. Nor would any accountant or businessman so understand it."

■■ There was no error in consolidating the two cases for trial over the objection of the defendants. It was stipulated by counsel that the defendants were equal partners and owners of the business. The evidence as to additional unrecorded and unreported partnership income applied to both of them, and the amount was divided equally between them in order to arrive at their individual tax deficiencies. Questions of consolidation are within the sound discretion of the court, and in this case it was exercised wisely. Gaudio v. United States, 4 Cir., 179 F.2d 300; Dowdy v. United States, 4 Cir., 46 F.2d 417, 421; Tincher v. United States, 4 Cir., 11 F.2d 18, 21. One might almost say that it would have been an abuse of discretion to require separate trials as to the two defendants since it would have required unnecessary repetition of substantially the same evidence. See Federal Rules of Criminal Procedure, 8, 13, 18 U.S.C.A.

■ The defendants raise other questions of evidence. They complain of the action of the trial judge in admitting evidence that they failed, during some of the years between 1946 and 1950, to file intangible tax returns under the law of North Carolina. They objected when the evidence was offered and the court ruled that it should be received, but was relevant only on the question of intent. On cross examination it was brought out that the witness had no knowledge as to whether the defendants were required to file the returns under the state law. No further attention was paid to the point during the subsequent days of the trial. The Government's attorney did not press the matter any further and the attorneys for the defendants did not move to strike the evidence from the record or request any special instruction as to its effect, and none was given. Obviously the incident was insignificant and it cannot be said that the jury was prejudiced against the defendants by the knowledge that they did not file certain tax returns under the state law, when there was nothing to show that the statute required the returns to be made.

■ During the trial the judge admitted in evidence the testimony of Merrill Wyatt, Group Supervisor in the Intelligence Division in Greensboro. He was shown to be a qualified expert in tax matters. He prepared a computation of the tax liability of the defendants for each of the years in question, based on the testimony of Government witnesses and Government exhibits. The computation was offered in the form of schedules for each of the tax years showing the additional income of the partnership to be accounted for and the additional taxes due by each partner. It is contended that the ruling was wrong because the evidence was offered in such a manner as to lead the jury to conclude that they were required to accept as true the evidence on which the computation was based instead of allowing the jury to find the facts for themselves.

The record does not support the contention. On the contrary the court warned the jury before the computation was submitted to them that the calculations were based on evidence that had been previously adduced and that if the jury did not believe the evidence and did not find that the income indicated had been realized by the defendants, then the computations would have no relevancy. Again in the charge to the jury the court pointed out that the computation was based in part on the evidence of sales admitted to have been made by the defendants, in part on the testimony of a number of witnesses from various parts of the country who testified that they had bought signs from the company, and in part on the *admission* by the defendants that if certain additional witnesses were present they would testify that they had paid various sums to the defendants for signs which they bought. After enumerating these three sources of proof the Judge told the jury in effect that the experts' calculations were admitted on

the assumption that the jury should find that the assumed facts were actually true, otherwise they would have to dismiss such of the calculations for which there was no supporting evidence. The defendants contend that the jury could have been misled by the use of the word "admission" in referring to the testimony of witnesses not produced in court; but the jury was not told that the facts were admitted to be true but only that the witnesses if present would so testify. The preparation and submission to the jury of such summaries as were made in this instance by the witness Wyatt is well-nigh indispensable to the understanding of a long and complicated sets of facts, and the practice has the sanction of the courts. United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546; Beaty v. United States, 4 Cir., 213 F.2d 712, 719–721; United States v. Caserta, 3 Cir., 199 F.2d 905, 908.

■ The appellants complain that the court erroneously excluded evidence which would have shown that the Government had collected a part of the taxes claimed to be due by the defendants. The witness Wyatt was asked on cross examination whether the Government had not sold all the lands and all of the personal property of the partners and collected approximately $50,000 in taxes. On objection of the Government the evidence was excluded for the reasons stated in the following pronouncement of the District Judge: "It is not material whether the Government has succeeded in getting all the taxes or part of it. The question is whether or not the defendants in filing a return filed a false and fraudulent return. It is not necessary that the defendant should succeed in his efforts to defraud the Government out of taxes. It is not material whether the Government ultimately collects it or not, the question is whether the defendant in filing his return filed one that he knew to be false when he did it, and did it with the intent to evade the payment or attempt to evade the payment of his taxes in that year, and so if an offense is committed it is committed when that hap-pened, when he filed his return." This ruling was correct. It is true that events subsequent to the filing of tax returns charged to be fraudulent may be relevant if the evidence in regard thereto throws any light upon the intent with which the returns were filed; Berkovitz v. United States, 5 Cir., 213 F.2d 468; United States v. Matot, 2 Cir., 146 F.2d 197; Heindel v. United States, 6 Cir., 150 F.2d 493; but in this instance there is nothing to show that the forced collection of the taxes by the Government after the discovery of the crime throws any light upon the intent of the defendants when they filed their returns.

■ Finally it is urged that the District Judge erred in refusing defendants' motion for a new trial. The motion was based on evidence of certain contacts between Assistant United States Attorney E. L. Gavin, Jr., who participated in the prosecution, and Lonnie Buchanan, one of the jurors in the case. Buchanan had served as a juror during the criminal term of court in June and was called back in October of the same year as a member of the panel from which the jury in the pending case was chosen. Both of the men lived in Sanford, which is 58 miles from Greensboro where the court was held. Buchanan, an elderly man, had delivered ice to Gavin's family when Gavin was a child, and Gavin had gone to school with Buchanan's daughter. During the June Term Gavin gave Buchanan a ride in his car on one or two occasions in going to or from court. Just before the Turner trial began Buchanan's daughter-in-law requested Gavin to take Buchanan to court on the opening day and Gavin did so. During the ride Buchanan asked what sort of cases were going to be tried and Gavin replied "income tax and other cases." During the selection of the jury Buchanan was called to the jury box and asked the judge to excuse him because he was 72 years of age, had served in June and had a sick brother. Gavin thereupon in open court joined in the request, but the judge refused, and Buchanan was sworn as a member of the jury. In the afternoon of

the same day Buchanan asked Gavin to drive him home but Gavin replied that he was not going home. This conversation was reported to the court by Gavin who asked the judge to instruct the jury not to talk to anybody about the case and the judge gave the instruction. Gavin had come to court prepared to stay in Greensboro during the trial and did not go home during the trial except for one night for a change of clothing. There was no further conversation or contact between the men during the trial.

It is urged that a new trial should have been granted because these friendly contacts between the juror and the prosecutor, unknown to the defendants' attorneys, were of such a character as to prejudice the juror in favor of the prosecution and deprive the defendants of a fair trial by twelve impartial jurors. We do not agree. The incidents complained of sprang naturally from the casual and friendly relationship between the two men which had existed for many years. The relationship between them could have been readily ascertained by the defendants' attorneys if they had seen fit to question the juror before he was sworn; and if they remained ignorant of the fact they had only themselves to blame. Doubtless the prosecuting attorney would have been wiser and more discreet, if out of abundance of caution he had refrained from any kindness or manifestation of friendship towards a member of the jury;[1] but the whole matter was carefully gone into at a hearing before the experienced judge who tried the case, and he came to the conclusion that there was no evidence of misconduct or impropriety which in any way affected the decision of the case.

The facts were far different in the contrary decisions on which the defendants rely. See Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654; United States v. Rakes, D.C.E.D.Va., 74 F.Supp. 645. It would have been a miscarriage of justice to grant a new trial in the pending case in which the evidence disclosed no reasonable doubt as to the defendants' guilt.

Affirmed.

---

[1]. In Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, the court said: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. Mattox v. United States, 146 U.S. 140, 148–150, 13 S.Ct. 50, 52–53, 36 L.Ed. 917; Wheaton v. United States, 8 Cir., 133 F.2d 522, 527."