**UNITED STATES of America**

v.

**Joseph P. DUPONT.**

Cr. No. 58–153.

United States District Court
D. Massachusetts.

Jan. 19, 1959.

Anthony Julian, U. S. Atty., Geo. A. Lewald, Asst. U. S. Atty., Boston, Mass., Norman A. Hubley, Winthrop, Mass., for the United States.

Edward Davis, John P. Muldoon, Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

Defendant has been charged in an indictment in 62 counts with aiding and assisting in the presentation of false and fraudulent income tax returns by several persons for the calendar years 1953, 1954 and 1955. Defendant, among other activities, carried on a business of assisting others in the preparation of income tax returns. Defendant moves to suppress as evidence all information and records obtained directly from or as a result of examination by agents of the Internal Revenue Service of defendant's copies of tax returns of his clients.

There was some conflict of testimony as to what took place between defendant and the agents, but the court finds the following as the relevant facts: On August 28, 1956, George Pace, an Internal Revenue Agent assigned to the New Bedford office, and Joseph R. O'Malley, a Special Agent with the Intelligence Division, Internal Revenue Service, first went to defendant's home and had some conversation with defendant's wife in defendant's absence. At that time they saw no records. They returned the next day when defendant was at home. They introduced themselves and showed him their identification cards, which he did not look at because, as he testified, he already knew Pace as a revenue agent. O'Malley then told defendant that he was from the Intelligence Division and that he had been assigned to investigate defendant's tax returns for 1953, 1954 and 1955 and explained that the participation of the Intelligence Division contemplated an investigation rather than a routine examination. Defendant told him he was familiar with filing tax returns and that he knew what the Intelligence Division represented. O'Malley then made no further explanation of the significance of his presence.

The agents then discussed with defendant his own personal income tax returns and the nature of the records he kept. He told them the only record of his business of preparing tax returns was found in the copies which he retained of the returns he prepared for his clients. He had made a notation on each of these of the amount of the fee charged. These copies of the returns for 1954 and 1955 were filed together in a filing cabinet in the office, the 1954 return being sleeved into the 1955 return of the same taxpayer. The 1953 returns were in another room, but defendant brought them into

the office. He told the agents he had no objection to their examining any of his records in the office. After asking defendant some questions as to his personal history, they proceeded to go through these retained copies, taking down the names of the clients and the amounts charged them. They spent three days on this, then suspended work until about September 24, when they returned for another day. O'Malley again saw defendant on October 11. They discussed an apparent understatement the agents thought they had found in defendant's own tax return, which defendant said he could explain. O'Malley then told defendant that the investigation was to be extended and that an investigation had been ordered to determine whether or not there had been an attempt by defendant to prepare false and fraudulent returns for others.

Defendant contends that this was from the start the real purpose of the investigation. However, on the evidence the only instructions it can be found that O'Malley received in August were to investigate possible evasion by defendant of his own income tax. It is true that at that time the Internal Revenue Service was in possession of information involving the names of certain of Dupont's clients whose allegedly false returns are now made the basis of some of the counts of the indictment. This, however, appears to have been information received from banks as to certain checks and not information indicating that these clients had filed false returns. From all that now appears, when the agents began this investigation they suspected it might show violation of the internal revenue laws by defendant, they thought it most likely that any such violation would prove to be evasion by defendant of his own income tax. They had no specific suspicion that defendant might be concerned in any false returns filed by his clients and were not, at the time they examined these records, specifically looking for evidence to support the charges in the pending indictment.

Defendant argues that the fact that the agents listed the names of clients from the 1955 return is significant. Of course, these returns of the clients for 1955 were made out by defendant for them in 1956 and the fees received with respect to them were income to him in 1956. Hence these returns were not relevant to an investigation of defendant's own tax returns for 1953, 1954 and 1955. However, there is no good reason to doubt O'Malley's statement that this listing from the 1955 returns was made by mistake. Defendant himself, when asked for records pertinent to his returns for 1953, 1954 and 1955, handed over to the agents his copies of the clients' returns for these tax years. The agents made no effort to conceal the fact that they were working on the clients' 1955 returns. In fact they specifically called defendant's attention to one of them when they found no notation on it of the charge made to the client. Further it was not until some time after that incident that it occurred to defendant himself that a mistake was being made.

█ █ The real issue here is whether defendant voluntarily turned over these copies of his clients' returns to the agents for examination or whether he was induced to do so by fraud or misrepresentation on their part. Of course, a defendant has no right to the suppression of evidence which he has freely and voluntarily turned over to the investigators. The fact that the taxpayer was not formally warned of his constitutional rights before turning over his papers to the agents does not in itself make the production of these papers involuntary. United States v. Frank, 3 Cir., 245 F.2d 284, 286; Turner v. United States, 4 Cir., 222 F.2d 926, 931; United States v. Burdick, 3 Cir., 214 F.2d 768; Hanson v. United States, 9 Cir., 186 F.2d 61.

Defendant contends that his apparently voluntary consent in this case was vitiated because of fraud or misrepresentation by the Internal Revenue agents and that therefore the resulting examination was an unreasonable search of his papers.

The courts are not in agreement as to the extent to which a defendant in a criminal tax case is entitled to the suppression of evidence obtained by fraud, misrepresentation or concealment on the part of the investigators. In the most recent case in this circuit, Chieftain Pontiac Corp. v. Julian, 209 F.2d 657, 659, the indication by way of dictum is that the majority of the court felt that the use of false representations to obtain disclosure from the defendant does not constitute an unreasonable search and seizure. Cf. Smith v. United States, 1 Cir., 210 F.2d 496, 499. In some cases it has been held that evidence should be suppressed where agents have positively misrepresented that they were merely making a routine check or were interested only in determining civil tax liability, or even where they merely concealed the fact that an agent examining the books of taxpayer was from the Intelligence Division, which is concerned with the case from the standpoint of possible criminal prosecution. United States v. Wheeler, D.C., 149 F.Supp. 445, reversed on other grounds, 3 Cir., 256 F.2d 745; United States v. Lipshitz, D.C., 132 F. Supp. 519; United States v. Guerrina, D.C., 112 F.Supp. 126, modified at D.C., 126 F.Supp. 609. A contrary view seems to have been taken in Montgomery v. United States, 5 Cir., 203 F.2d 887, 892, 893, and United States v. Wolrich, D.C., 119 F.Supp. 538.

Whatever the facts and conclusions are in Wheeler, Lipshitz and Guerrina, in the present case no fraud on the part of the investigators can be found. Certainly the instant case reflects no facts upon which to base a conclusion that a *promise* was made to taxpayer that only civil liability would be considered regardless of what the examination revealed. In fact there were no promises made of any nature. Before defendant allowed the agents to see any of his papers, he was given an opportunity to examine their credentials. O'Malley's identity card would have shown that he was with the Intelligence Division. Moreover, O'Malley expressly informed defendant that he was from the Intelligence Division and that he was engaged in an investigation rather than a routine audit. Any further explanation was cut short by defendant's own statement that he knew what the Intelligence Division represented. In the light of his experience with tax matters, it is fair to infer that he did know the implication of participation of the Intelligence Division. At any rate, under the circumstances and in the face of his statement, there was certainly no misrepresentation by the agents in failing to further explain this aspect of the matter.

Defendant argues, however, that the agents represented that they were investigating only the question of evasion by defendant of his own personal income taxes and said nothing about the fact that they were investigating any matter connected with the returns of his clients. Defendant has failed to show that there was any misrepresentation or concealment here. On the evidence it can only be found that O'Malley was in fact specifically looking into possible tax evasion by defendant himself and that his specific instructions went no further than that. The rather vague testimony as to information received which mentioned the names of one or two of his clients does not justify any finding that there was at the time of the investigation here in question any definitely formed suspicion that defendant had aided any client of his to file a false return, or that any investigation of his clients' returns was decided upon until after the examination of defendant's papers was concluded.

Nothing in the agents' conduct indicates that they were, at the time they examined these papers, looking specifically for evidence of the violations charged in the present indictment. They did not ask specifically to see defendant's copies of his clients' returns until after he had told them that these contained his only record of his income from that phase of his activities. While they did copy some information which was not relevant to the tax years they were investigating, this was due to an error in which defendant also seems to have shared. There is nothing to show that

they did not make a genuine check on defendant's own tax returns to the point where they satisfied themselves that no criminal prosecution was warranted.

■ Thus there is no ground for holding that the agents made a misrepresentation to defendant to induce him to allow them to examine his records. He must be found to have consented voluntarily to this examination knowing that this was an investigation of a serious nature which might lead to criminal prosecution. Turner v. United States, supra, 222 F.2d 926. While the violation eventually charged was not that which the investigators were specifically looking for, he must have known that the agents would not ignore it but on the contrary utilize any evidence of criminal violation which they might discover in the course of their inspection of the papers turned over to them. As Judge Goodrich stated in United States v. Frank, supra, 245 F.2d at page 286, "we do not think any taxpayer considers an audit by a revenue agent to be a call for purely social purposes." United States v. Achilli, 7 Cir., 234 F.2d 797, 805; United States v. Wolrich, D.C., 119 F.Supp. 538.

Defendant's motion to suppress is denied.