**Luther F. GRANT and Sirrka V. Grant,**
**Petitioners-Appellants,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 360, Docket 26785.

United States Court of Appeals
Second Circuit.

Argued April 20, 1961.

Decided June 19, 1961.

———◆———

Joseph W. Burns, New York City (John P. Cuddahy and Austin, Burns, Appell & Smith, New York City, George Bond, Jr., N. Earle Evans, Jr., and Bond, Schoeneck & King, Syracuse, N. Y., on the brief), for petitioners-appellants.

Edward J. McLaughlin, Asst. U. S. Atty., New York City (Justin J. Ma-

honey, U. S. Atty., Albany, N. Y., on the brief), for defendant-appellee.

Before WATERMAN, MOORE and SMITH, Circuit Judges.

J. JOSEPH SMITH,. Circuit Judge.

Taxpayers moved prior to indictment to suppress evidence obtained from them by Internal Revenue Agents in investigation of their income tax returns for 1952, 1953 and 1954. After hearing, the District Court relying on Sclafani (United States v. Sclafani, 2 Cir., 1959, 265 F.2d 408, certiorari denied 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534), denied relief for failure to show any affirmative misrepresentation, fraud, deceit or some scheme to mislead. See also two prior decisions on procedural issues in this case. 282 F.2d 165; United States v. Foley, 283 F.2d 582.

The investigation and audit of Dr. Grant's income tax returns for the year 1953 were originally undertaken on May 26, 1955 by Internal Revenue Agent Morris S. Solomon. After Solomon's resignation, the audit was reassigned in January 1956 to Internal Revenue Agent A. R. Aiello, and was later expanded to include 1952 and 1954. During the course of the investigations, waivers were obtained from Dr. Grant and his wife from time to time in order to toll the running of the statute of limitations. On the third occasion, Dr. Grant requested a waiver of interest, but when told that could not be granted, signed the waivers anyway. On January 30, 1957 Special Agent Howland of the Intelligence Division entered the case to determine whether fraud was involved. He was introduced to Dr. Grant as a special agent. Thereafter the investigation was joint, the Audit Division and the Intelligence Division cooperating under the direction of the Intelligence Division. Log books of Dr. Grant for the years 1952–54 and cancelled checks on two banks for the same years were turned over by Dr. Grant or by his employees on his instructions to Special Agent Howland on September 16, 1958 and returned November 19, 1958. Checks of Dr. Vuornos

(Mrs. Grant) for the same years were turned over to Howland on January 15, 1959. Howland signed a receipt on September 16, 1958 as "Special Agent, Intelligence Division." This receipt was given to Dr. Grant, according to Mrs. Zalkauskas. On April 13, 1959 Dr. Grant wrote to Howland as "Special Agent, Intelligence Division." By letter of June 3, 1959 Dr. Grant was advised that criminal proceedings against him were being considered. He testified that this development was a surprise and shock to him. He also testified that the records had been turned over under the impression that it was his duty to do so.

No summons had been issued and the only written demand for records was in the letter of the Internal Revenue Agent in the early, civil, stage of the investigation, calling upon the taxpayer to have all books and records available for examination. There is no evidence that reference was made to the statute, Section 7602 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7602. Apparently petitioners contend that a remark of Howland's, which as Dr. Grant recalled it, was "Now, you don't have to give me this information, but we can get it anyway," amounted to an illegal demand for self-incrimination. It may be, however, that the special agent was attempting to inform the taxpayer of his right to withhold information now that the investigation had shifted from audit of civil liability to search for evidence of fraud. It would of course be far preferable, so that it may be made certain that the choice of the taxpayer be an informed choice, that written warning be given when the civil audit is suspended as such, and the investigation becomes one to determine whether criminal or civil fraud penalties should be sought by the government. This would not only protect the taxpayer's constitutional rights, but also obviate much of the delay in tax cases caused by such motions as the one before us.

Two questions were raised by petitioners, compulsory self-incrimination in violation of the Fifth Amendment, and un-

reasonable search and seizure in violation of the Fourth Amendment. The court found that there was nothing to show any affirmative misrepresentation, fraud, deceit, or scheme to defraud, and dismissed the petition to suppress the evidence. On the showing made here, this finding was clearly correct.

■■ The disclosures here were apparently quite willing, although possibly in ignorance of rights. Even the possible ignorance of rights is highly doubtful in view of the special agent's statement that petitioner did not have to give the information, and of petitioner's admission, R. p. 163, that Henry Solomon may have told him in 1958—and he had talked with Henry Solomon prior to April 15, 1958—that what they were trying to do was put him in jail. To be sure, he later testified on redirect that his memory was refreshed by a Medical Economics Journal shown him by his counsel, which led him to place the date after February 29, 1960. There is no evidence that any search was made by the agents. The records taken were produced on request, either by the taxpayer personally, or by employees of the taxpayer under taxpayer's instructions.

Petitioner differentiates this case from Sclafani in that here proof was adduced of the distinct nature and function of the Special Agent and of the criminal investigation aspect which the case took after his entry into the picture. This of itself is not sufficient to change the result here, cf. Turner v. United States, 4 Cir., 1955, 222 F.2d 926, although it may be a factor in determining whether the records were obtained by fraud. United States v. Wolrich, D.C.S.D.N.Y.1955, 129 F.Supp. 528.

■ One difficulty with the claim that entry into the criminal investigation makes production of records thereafter compulsory self-incrimination is that the privilege does not first arise at that time, but exists in the earlier civil audit stage of the investigation, and if not claimed, must be considered "waived" as to material then produced. Strictly speaking, of course, there is seldom any true waiver, for at the inception of the civil audit criminal proceedings are not under active consideration by either agent or taxpayer. If the disclosure is voluntary, however, the records turned over in the civil audit may be used without restriction. The situation was materially different during the period ending in 1952, when the practice of a grant of immunity for voluntary disclosure was the motive for the production of records. In cases arising during that period, the issue was whether the voluntary turnover antedated the beginning of the investigation.

Our attention has not been called to any federal or state precedent in other fields for a requirement of warning of possible prosecution on a request by criminal investigators for information prior to appearance before a committing magistrate, so long as no coercion is claimed. Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Turner v. United States, supra, 222 F.2d at page 931.

Since there was no search established, and no compulsion could well be found on the showing made, we do not have plainly presented any question of waiver of the constitutional prohibitions against unreasonable search or against compulsory self-incrimination. On a more complete showing at the trial the picture may, of course, be substantially changed. The judgment dismissing the petition is affirmed.