**UNITED STATES of America,
Plaintiff,**

v.

**MORTON PROVISION COMPANY, Inc., a Pennsylvania corporation, and Morton Gekoski, individually, Goldberg Bros., Inc., a Delaware corporation, and Morris Goldberg and Alec Goldberg, individually, and Sydney Hendler, individually, Defendants.**

**Crim. A. No. 1865.**

United States District Court
D. Delaware.
Nov. 4, 1968.

Alexander Greenfeld, U. S. Atty., and L. Vincent Ramunno, Asst. U. S. Atty., Wilmington, Del., for plaintiff the United States.

Charles J. Bogdanoff, Philadelphia, Pa., for defendants, Morton Provision Co., Inc., and Morton Gekoski.

Joseph H. Flanzer, of Flanzer & Isaacs, Wilmington, Del., for defendants, Goldberg Bros., Inc., Morris Goldberg, Alec Goldberg and Sidney Hendler.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is a motion by defendants to suppress certain evidence and statements allegedly obtained by the Government in violation of defendants' Fourth and Fifth Amendment rights. Defendants are individuals and corporations engaged in the slaughterhouse and fresh meat business who are charged in this action with 10 counts of transporting and offering for transport across state lines scrap portions of beef carcasses[1] which were uninspected and not decharacterized, all in violation of 21 U.S.C. § 78. An extensive record of the facts relevant to a determination of this motion was developed at four full days of hearings; however, the record is so replete with contradictions and confusing testimony that only a general summary of the relevant events is possible. For clarity, the facts as to each of the three meat businesses[2] will be considered separately.

*Morton Provision Company, Inc.:* On August 26, 1965, Clarence Cowgill, an investigator for the United States Department of Agriculture (USDA), received information that a shipment of meat was to leave Goldberg Bros. and Sidney Hendler's in Wilmington, Delaware in a truck bound for either New Jersey or Pennsylvania. Mr. Cowgill placed the two plants under surveillance, observed a truck being loaded, then followed the truck to Morton Provision Co. in Philadelphia. (Transcript of evidentiary hearing held March 4, 1960 and May 8–10, 1968 ("T"), p. 75). While the contents of the truck were being unloaded under defendant Gekoski's supervision, Cowgill approached Gekoski, identified himself as a Department of Agriculture Investigator, explained to Gekoski "that it appeared that he was violating the Federal Meat Inspection Act," and asked permission to observe the unloading (T. 76). Permission was granted, the unloading was completed, and Cowgill engaged Gekoski in conversation about the shipments. Cowgill testified that he informed Gekoski of his right to ask Cowgill to leave and to refuse to answer any questions (T. 83). Cowgill also testified that Gekoski made a phone call to an attorney, after which Gekoski said he had been advised to cooperate fully (T. 78–9). There is some question, however, as to whether such a phone call was ever made (T. 217–8, 574, 735). Cowgill testified that at some time during the encounter, he explained to Gekoski the penalties for violation of the Meat Inspection law (T. 82, 85, 219).

The following day, August 27, 1965, Cowgill returned to Gekoski's plant with two City Inspectors (T. 83). During the course of this visit, Cowgill asked Gekoski for the invoices covering the previ-

---

1. Beef heads, lungs, hearts, udders, tripe, and spleens, all of which are unsuitable for human consumption but evidently acceptable for use as dog food.

2. The defendants are grouped into three meat businesses as follows: Morton Pro-

vision Co., Inc., (operated by defendant Morton Gekoski); Goldberg Bros., Inc., (operated by defendants Morris Goldberg and Alec Goldberg); and the single proprietorship of defendant Sidney Hendler.

ous day's shipment from Goldberg Bros. and Hendler. According to Cowgill's testimony on cross-examination, he explained to Gekoski that he needed the invoices to write up a report [3] but that Gekoski did not have to show him the invoices unless he wanted to (T. 85). According to Cowgill, Gekoski stalled for a short while because he was very busy but then voluntarily produced the invoices which Cowgill took from the plant to have photo-copied (T. 86–88). Gekoski's version of the incident is different:

"Q. Did [Cowgill] ask you for permission to examine these [invoices] when he came in?

A. Well, he said 'I would like to see them. I want to see them.'

Q. What did you say?

A. 'Well, do I have to show them to you?'

And that is when he said to me, 'Well, look, you don't have to do anything, but we can get the records. I can force you to show this to me. It is easier if you comply.'

Q. Did you know what he meant when he said 'We can force you to show it to us.'

A. Well, I don't know whether I knew what he meant, but I just felt he could do it." (T. 209, 210).

Cowgill's next visit to Morton Provision was on September 9, 1965, for the purpose of obtaining Gekoski's signature on a prepared statement of facts relating to the events of August 26–27. Cowgill was accompanied by a USDA Inspector, Charles Morris. Both Morris and Cowgill testified that when the statement was presented to Gekoski, he read it, agreed that it was accurate, but said he wanted to take it home and show it to his brother, an attorney, before signing it (T. 661, 674). Gekoski was not specifically warned that the statement could be used against him in a criminal proceeding (T. 661–2, 675) but Cowgill stated that Gekoski was told he did not have to sign it (T. 675).

On September 20, 1965, Cowgill returned to Morton Provision to see if Gekoski had signed the statement.[4] According to Cowgill, Gekoski explained that he had consulted his brother, that his brother had advised him to sign it, but that his brother had advised him to add a specified paragraph to the statement (T. 680). Gekoski's brother's testimony, however, is to the contrary. He denied that he advised Gekoski to sign the statement or to add the extra paragraph; indeed, he testified that he reprimanded his brother for even talking to the USDA men and advised him not to sign the statements (T. 572–3). In any event, Gekoski signed the sworn statement as amended [5] on September 20, 1965.[6]

On December 7, 1965, Cowgill returned to Morton Provision with John Gould, a USDA compliance officer, for the purpose of examining Gekoski's records of transactions with Goldberg Bros. and

---

3. "Q. What did you tell Mr. Gekoski before you saw invoices? Or at any time in connection with invoices what did you tell Mr. Gekoski?
"A. Well, I explained to Mr. Gekoski * * * that it was my duty to write up a report, put the facts down in writing, and submit them to my superiors. What they did with them—I wouldn't know what they were going to do with it. But I explained the penalties as written out by law to him." (T. 85).

4. Cowgill first called on Gekoski September 14, 1965 to see if the statement had been signed but Gekoski said he had not yet shown it to his brother (T. 679).

5. The paragraph which Gekoski added read:
"*All* products from these sources have been sold *only* to dog food channels and not for human consumption. In the future we will *definitely* conform with the laws." (T. 588).

6. Ultimately, Gekoski testified that his brother had advised him not to sign but that since Cowgill told him "he was only looking to stop the practice and if I would cooperate with him, why, he didn't think there would be anything to it," there seemed to be no reason not to sign the statement (T. 734).

Sidney Hendler for the past several months (T. 47–8). According to Cowgill:

"A. * * * Mr. Gould also advised [Gekoski] * * * that he didn't have to show us anything or tell us anything; that it was of his own free will what he wanted to give us or say.

And he did offer the information that the records were on the second floor put away, and he would like to have a couple of weeks to get straightened around and get the records sorted out, and then we could come back in two weeks and go through the records. And we left." (T. 48). See also T. 141, 143.

Gekoski, on the other hand, testified that:

"A. Well, Mr. Cowgill came in, and after preliminary greetings he told me that he was there to get the records of the past six months of my books.

Q. And what did you say to that?

A. 'Well, do I have to give them to you?'

Q. And what was his reply?

A. 'Look, we can get the records, so you might as well not fight it because we can get them.'" (T. 194).

Gekoski later testified that he had consulted his brother before December 7 (T. 225) and that he understood Mr. Cowgill was investigating an alleged violation of federal law (T. 228).[7]

On January 4, 1966, Cowgill and Sigmund Zeitlin, a USDA special agent, called upon Gekoski to inspect the records. Zeitlin testified that he told Gekoski he did not have to say anything and that anything he said could be used "as evidence" (T. 179). Gekoski indicated to Zeitlin that he knew why he and Cowgill were there and Zeitlin testified that:

"A. He said in words to the effect that he don't know how he got in this mess and he did not realize the magnitude of it until it had been explained to him on a prior visit by Mr. Cowgill, that he wanted to clear it up as rapidly as possible, he wanted to cooperate with any representative of the Department in order to do this." (T. 179).

Cowgill and Zeitlin then began inspecting the Morton Provision records.

Two days later, on January 6, 1966, a second written statement summarizing facts culled from the investigation was presented to Gekoski for his signature. Gekoski again refused to sign until his brother had seen it and took the statement home with him. Gekoski brought the statement back the next day and signed it indicating that he had been advised to do so (T. 604).[8] The investigation of Morton Provision terminated at that point.

It is undisputed that, at no time during any of the above-mentioned meetings between USDA officials and Gekoski was Gekoski restrained or in any way deprived of his freedom (T. 231, 232–3, 234). Nor was any attempt made to arrest any person.

*Goldberg Bros., Inc.:* Cowgill's first visit to Goldberg Bros. was on September 22, 1965. He was accompanied by Bernard Snyder, a USDA investigator. According to Cowgill and Snyder, the purpose of the visit was to advise the Goldbergs of possible violations of federal law (T. 260). Both Goldbergs were warned that they need say nothing and that they could deny the USDA men

---

7. Gekoski testified that:
"A. Well, he was only investigating the—I don't know, I guess you would call them misdemeanors. * * *
Q. Well, what is a misdemeanor?
* * * * *
A. Well, when someone does wrong in my opinion it is a misdemeanor. It does not necessarily have to be a crime." (T. 227, 230).

8. Gekoski's brother testified that Gekoski never consulted him about this second statement (T. 592).

entrance to their plant (T. 264).[9] The entire visit was devoted to an explanation of the law and definition of the terms "offering for transportation" and "decharacterization" (T. 265–6, 532–4). Cowgill also asked Morris Goldberg to verify that the invoice Cowgill had obtained from Gekoski was an accurate representation of the August 26 shipment (T. 269). Cowgill and Snyder testified that at no time were the Goldbergs led to believe that the sole subject of the investigation was Morton Provision and that the Government had no interest in their end of the transaction (T. 262).

The Goldbergs, however, testified that, while they freely consented to the visit, they did so with the understanding that the investigation was not directed at them (T. 432, 462).[10] They also indicated that they had been given no warnings as to their rights (T. 434, 437, 439, 462–3).

On December 7, 1965, Cowgill returned to Goldberg Bros., this time with John Gould, for the purpose of examining records of transactions between Morton Provision and Goldberg Bros. over the period of a year (T. 271). The Goldbergs said they were busy but did permit Cowgill and Gould access to the records. Morris Goldberg assisted the two in the examination (T. 272–275). According to Cowgill, the Goldbergs were completely cooperative (T. 274). The Goldbergs, of course, admitted to being cooperative but asserted their ignorance of the true nature of the investigation.

One final visit was made by Cowgill and Zeitlin on January 12, 1968. The record is not clear on the purpose or events of that visit.

At no time was either Goldberg restrained or deprived of his freedom (T. 445–6, 481). No arrests were made or attempted.

*Sidney Hendler:* The dates and USDA personnel involved in the investigation of Hendler coincide with those in the Goldberg investigation. Like the Goldbergs, Hendler claimed that he had been led to believe the investigation had nothing to do with him (T. 502); Cowgill denied this (T. 335). Hendler also claimed that he had never been informed of his rights (T. 503–4). Cowgill testified, however, that Hendler seemed well aware of his rights and of the law:

"Q. As a result of anything that Mr. Hendler said to you, do you know if he knew that allowing you to look into those files might result in additional criminal prosecutions against him?

A. Yes, because Mr. Hendler did state when we asked him if we could look at his records, he said that he was fully aware of the law, he knew about it, that he had been having enough trouble with the [USDA] about other things, so he understood his rights. But he had no objection to our looking at his records." (T. 373).

Hendler himself testified that he knew causing uninspected meat to be transported across a state line was a crime (T. 506).

Hendler did permit the USDA men to inspect his records and, on January 12, 1966, Hendler signed a written statement prepared by Zeitlin (T. 330). According to Cowgill, Zeitlin specifically warned Hendler that the statement could

---

9. Cowgill testified that:
"A. Well, Mr. Alec Goldberg told Morris Goldberg 'We know we don't have to tell you anything of that nature, we have a lawyer, we pay him to advise us and tell us what to do, and we know that we don't have to answer any of your questions or talk to you.'" (T. 382).
Both Goldbergs denied having made any such statement (T. 446, 479).

10. Both Goldbergs were quite confused about how many visits the USDA men made and what transpired at each (T. 438, 464, 468–9). Their testimony that they were cooperative because they thought Morton Provision was the only company under investigation was apparently intended to apply to any and all visits made.

be used in evidence, both at the time it was signed and previously (T. 330–33).

At no time was Hendler restrained or deprived of his freedom (T. 508). No arrest was made or attempted.

Two preliminary matters concern the Court—the question of standing to object to the searches and the absence of Miranda warnings.

 *Standing:* The law is settled and the parties do not dispute that defendant corporations Morton Provision and Goldberg Bros. are protected by the Fourth Amendment and that corporate officers (here Gekoski and the Goldbergs) have standing to raise the Fourth Amendment rights on behalf of the corporations. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 388, 40 S. Ct. 182, 64 L.Ed. 319 (1920). Nor is there any question that defendant Hendler has standing to object to the search of his private business records. However, the Government raises the question of whether defendants Gekoski, Alec Goldberg and Morris Goldberg have standing to object on their own behalf to a search of records belonging, not to them, but to their corporations. The Government argues that, despite the fact that the corporations involved were essentially one or two man operations and the fact that evidence gathered from the searches of corporate records may be used against these three defendants personally, the ownership and possession of the records by the corporation and the fact that the searches were conducted on corporate property deprive these defendants of the ability to object to use of the records against them.

 While there may once have been merit to the Government's contention, see e. g. Lagow v. United States, 159 F. 2d 245 (2d Cir. 1946), and United States v. H. J. K. Theatre Corporation, 236 F. 2d 502 (2d Cir. 1956) ; cert. den. Rosenblum v. United States, 352 U.S. 969,

77 S.Ct. 359, 1 L.Ed.2d 323, the Supreme Court's ruling in Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) makes clear that Gekoski and the Goldbergs have standing. In Mancusi, a search of a union office shared by DeForte and several other union officials revealed certain union records which were ultimately used to convict DeForte of a serious crime. The court focused first on the ownership problem:

> "The papers which were seized in this case belonged not to DeForte but to the Union. Hence, DeForte can have personal standing only if, as to him, the search violated the 'right of the people to be secure in their * * * houses * * *' '(H)ouses,' * * * is not to be taken literally, and * * * the protection of the Amendment may extend to commercial premises." 392 U.S. at 367, 88 S.Ct. at 2123.

The Court then held (citing Katz v. United States, 389 U.S. 347, 352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) that "capacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." 392 U.S. at 368, 88 S.Ct. at 2124. DeForte's office was such an area because, though DeForte shared the office with other union officials, he "could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups." 392 U.S. at 369, 88 S.Ct. at 2124.[11] DeForte, therefore, had standing to object to the search.

The very same considerations apply to defendants Gekoski and the Goldbergs. Indeed, since the organizations involved here are quite small and the defendants evidently the proprietors of the entire

---

11. The Court noted too that DeForte spent "a considerable amount of time" in his office and had custody of the Union records at the moment of their seizure. 392 U.S. at 368–369, 88 S.Ct. 2120. The facts in this case are parallel.

operations, this case is even stronger than Mancusi. Accordingly, these three defendants have standing to object on their own behalf to the searches questioned here.

*Miranda warnings:* Defendant Gekoski contends that the statements signed by him on September 22, 1965 and January 7, 1966 must be excluded from evidence because the USDA investigators failed to warn him of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is no merit to this contention whatsoever. The language of Miranda is unequivocal:

> "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478, 86 S. Ct. at 1630.

■ Here the record is clear that none of the defendants was ever in custody or deprived of his freedom in any significant way (T. 231, 232–3, 234, 445–6, 481, 508). Hence Miranda does not apply. See Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

■ Turning now to the validity of the searches and the statements, the fundamental issue as to both is whether defendants waived their rights under the Fourth and Fifth Amendments. Unless defendants waived their rights under the Fourth Amendment, the searches cannot stand because here, the USDA men had no search warrants, the searches were not incident to a lawful arrest, and there were no extraordinary circumstances justifying a warrantless search. See Davis, Federal Searches and Seizure (1964), pp. 5, 96, 171. And if defendants waived their Fifth Amendment

rights, there is no need to make further inquiry with regard to the statements.

■ The key element in establishing waiver of fundamental rights is whether the parties voluntarily and intelligently consented to official intrusion into the protected realm. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Here, the record is clear that defendants consented to the searches and statements. The question is raised, however, whether the consent in each case was given with the requisite understanding of the nature of the investigation. Defendants contend that the record demonstrates a failure on the part of each USDA man to specifically apprise defendants of the possibility of criminal proceedings and the possibility that any evidence obtained by search or any statement might be used against them in a criminal proceeding. Without such information, the contention goes, the consents could not have been voluntary and intelligent.

The Court has reviewed the record thoroughly and has reached the following conclusions as to the facts:

The USDA men did not specifically state to the defendants that the investigation would lead to criminal prosecutions. Nor did they state that any evidence uncovered in the investigation could be used against the defendants in criminal prosecutions. However, neither did the USDA men state or affirmatively intimate that no criminal prosecution would ever stem from the investigation [12] and, even if they did convey the impression that their actions were part of a routine investigation aimed at explaining the meaning of and establishing compliance with the meat inspection laws, there was sufficient discussion, argument, and warning about actual violations of the law, the penalties involved, and defendants' right to remain silent to

12. With regard to defendants Alec Goldberg, Morris Goldberg, and Sidney Hendler, the Court is of the opinion that the USDA investigators made no representations which would justify the conclusion that the investigation was directed only at Morton Provision and that these three defendants were in some way immune from prosecution.

apprise defendants that punitive action was within the realm of possibility.

 Accordingly, the Court finds that the failure to apprise defendants in certain terms that the investigation and any evidence discovered could be used against them in criminal prosecution was not sufficient to impel the conclusion that defendants' consents were not voluntary and intelligent. The very presence of the Government agents, their behavior, the dialogue between agents and defendants, and the extended period of time over which the investigations were conducted provided ample warning of the possible consequences and sufficient opportunity to digest the passing events and seek advice. Any representation that the investigations were "routine" did not constitute deception and misrepresentation sufficient to destroy the voluntariness of the consents.

These findings have ample support in the case law surrounding investigations conducted to enforce and administer the Internal Revenue laws. The leading case is Turner v. United States, 222 F.2d 926 (4th Cir. 1955). There, several Government agents conducted an investigation of the Turners' partnership and individual tax returns, during which the agents examined numerous books and records with the Turners' consents. The partners were told that they need not answer the questions but they were not told that their answers might be used against them in a criminal prosecution. (222 F.2d at 930). The Turners contended that:

" * * * revenue agents who secure the consent of a taxpayer to an examination of his books with intent to obtain evidence and use it in a criminal prosecution, are guilty of deceit unless they divulge their purpose, and

* * * the obtaining of information in such a manner violates the Fourth Amendment * * * and even if the examination is begun solely to ascertain the civil liability of the taxpayer and evidence of crime is unearthed, the taxpayer must be warned and given an opportunity to withdraw his consent * * *." 222 F.2d at 930.

The Court rejected the partners' contentions and held that:

"The evidence is silent as to whether Agent Forbes began the investigation as a routine examination to ascertain the civil liability of the defendants or intended from the beginning to search for evidence of crime. But even if the latter assumption be made, there was no violation of the taxpayer's constitutional rights. * * *

"It has been expressly held time and again in tax evasion and other criminal cases that it is not essential to the admissibility of statements secured by officers of the law from a defendant that he should be first warned that the information might be used against him in a criminal case, provided that it was voluntarily and understandingly given." 222 F.2d at 931.

 Thus, failure to give specific warning about possible criminal aspects does not weigh against a consent freely given.

United States v. Mancuso, 378 F.2d 612 (4th Cir. 1967); cert. den. 390 U.S. 955, 88 S.Ct. 1051, 19 L.Ed.2d 1149, modified on other grounds, 387 F.2d 376, reaffirms the conclusion in Turner. In Mancuso, several revenue agents obtained evidence and statements relative to a charge of income tax evasion with the consent of the accused after he had been warned of his right to remain silent. The accused had consulted his attorney [13]

13. The record in this case demonstrates that Gekoski had sufficient opportunity to and did on at least one occasion consult an attorney. The record is not clear as to whether the remaining defendants ever actually consulted attorneys. In any event, the presence or absence of legal advice is relevant only to the question of knowing consent, there being no right to counsel at the stage of the proceedings in question here. See Schlinsky v. United States, 379 F.2d 735 (1st Cir. 1967); Selinger v. Bigler, 377 F.2d 542, 543 (9th Cir. 1967); Smith v. United States, 250 F.Supp. 803, 806 (D. N.J.1966) and cases cited therein.

but claimed no knowledge of his legal right to resist investigation. The Court held:

"The courts uniformly hold that a taxpayer's ignorance of the nature of an investigation by the Internal Revenue Service and of his legal right to resist 'is insufficient ground for suppression of evidence voluntarily given.' [Citing Turner v. United States, supra] * * *.

"Revenue agents, during the course of an investigation of a taxpayer's returns, and prior to determining upon criminal prosecution, 'have no duty to apprise a taxpayer that he need not furnish requested information and that if he does furnish such information it may be used against him in criminal proceedings.' United States v. Spomar, 339 F.2d 941, 942 (7th Cir. 1964), and cases cited therein." 378 F.2d at 619.

United States v. Sclafani, 265 F.2d 408, 414 (2d Cir. 1959) and United States v. Wolrich, 119 F.Supp. 538, 540 (S.D.N.Y. 1954) also support the Court's finding here.

All of the cases cited, of course, deal with investigations by Internal Revenue agents to enforce the tax laws. However, the same principles have been applied in non-tax cases, see United States v. Scully, 225 F.2d 113, 116 (2d Cir. 1955), cert. den. 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (testimony before a Grand Jury) and United States v. Andreadis, 234 F.Supp. 341 (E.D.N.Y. 1964), (mail fraud, misbranding of drugs, false advertising), and apply with equal weight here.

 The Court has not ignored defendants' testimony that the Government agents procured the consents by representing that they could force compliance with the requests to search if it were necessary. In light of the agents' vigorous denial of any such representa-

tions and the view of the Second Circuit that the statement "Now, you don't have to give me this information, but we can get it anyway" is not sufficient to destroy the voluntariness of consent, Grant v. United States, 291 F.2d 227, 228 (2d Cir. 1961),[14] this Court finds that defendants have not, by this testimony, presented a case of coercion sufficient to warrant the conclusion that the Government has not carried its burden of showing voluntary consent.

In accordance with the foregoing, the defendants' motions for suppression are denied.

Submit order in accordance herewith.

---

14. Decision vacated on grounds that order denying a motion to suppress is not an appealable order, Grant v. United States, 369 U.S. 401, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962).