**UNITED STATES of America,**
**Appellee,**

v.

**Joseph L. SCLAFANI, Appellant.**

**No. 217, Docket 24137.**

United States Court of Appeals
Second Circuit.

Argued Jan. 12, 13, 1959.

Decided March 30, 1959.

Certiorari Denied June 22, 1959.

See 79 S.Ct. 1436.

Albert I. Schmalholz, New York City, for appellant.

Cornelius W. Wickersham, Jr., U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y. (Marie L. McCann, Asst. U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y., on the brief), for appellee.

Before MEDINA, LUMBARD and BURGER,* Circuit Judges.

LUMBARD, Circuit Judge.

The appellant, Sclafani, was convicted on seven counts of an eight count information [1] charging evasion of corporate and personal income taxes under § 145 (b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 145(b), for the years 1945–49, and was sentenced to concurrent terms of 15 months on each count and to fines of $5,000 on the first and sixth. Six counts were submitted to the jury on the circumstantial net worth theory and the seventh, charging evasion of personal income tax in 1948, was submitted on the failure to report a specific item of personal income. The appellant has raised seven objections here, which fall into five classes, as follows: (1) that the government failed to prove its net worth case by failing to establish opening net worth and by failing to demonstrate the source of income during the contested years; (2) that his several motions to suppress certain evidence should have been granted since it was obtained from him in the course of an illegal search and seizure; (3) that he was rendered immune from prosecution by virtue of having been ordered to give certain testimony before a Grand Jury investigating his corporations after he was subject to the instant information; (4) that he was prejudicially denied a bill of particulars; (5) that counts four

---

* Sitting by designation pursuant to 28 U. S.C.A. § 291(a).

1. The first three counts of the information charged Sclafani with attempting to evade taxes owed by the corporation for 1947, 1948 and 1949 by the filing of false corporate returns. Counts four and five charged him with attempting to evade taxes due from him and his wife for the years 1945 and 1946 by making and filing false and fraudulent statements of his financial condition with the Treasury Department in 1950 and 1951. Counts six, seven and eight charged him with evading personal income taxes for the years 1947, 1948 and 1949 by filing false returns. Count two was dismissed with the government's consent before the case went to the jury.

and five, which charged the making of false and fraudulent statements of financial condition to the Treasury Department in an attempt to evade taxes, were time barred. We find that the government's evidence amply supported the submission of the net worth case to the jury; and that appellant's rights before and during trial were not prejudiced. Because the conviction and sentence are sustainable whether or not counts four and five were proper, we need not and do not pass on whether they were time barred. We affirm the conviction.

I—Proof of the government's net worth case: Sclafani claims that the government failed in two essential elements of the proof of its case, in that it (A) failed to prove the lack of a "possible source" of funds in addition to those allowed by the government in the net worth statement it used for the opening date of January 1, 1945, and (B) that it failed to show that such increases in net worth as may have been proved were the result of unreported income to the taxpayer. We find that the government's proof was sufficient as to both aspects of its case. In so doing we have borne "constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." Holland v. United States, 1954, 348 U.S. 121, 129, 75 S.Ct. 127, 132, 99 L.Ed. 150.

(A) Sclafani's claim that the government failed to prove the lack of a possible source of additional funds held by him on January 1, 1945 is based solely on the government's alleged failure to rebut his uncorroborated claim that he had received a secret cash gift of $125,000 from his father-in-law, Rinelli, in 1938. Sclafani has not previously and does not now claim that the government excluded from opening net worth funds which he had received from any other source; he does not claim that the government failed to pursue relevant leads advanced by him.

Sclafani first claimed that he had such a secret hoard when he was questioned by Agent Sonkin, who, in 1950 in the course of a routine audit of the 1947 corporate return of Joseph L. Sclafani, Inc. discovered $149,000 of payments by check either directly to Sclafani or to cash. Since the corporate books stated that the payments had been made not to Sclafani but to creditors, Sonkin asked Sclafani for an explanation of the discrepancy. Sclafani claimed that the payments were made to him in repayment for equal sums advanced to the creditors on behalf of the corporation by him personally from a large secret cash hoard in 1946. Against this background he supplied Sonkin with a personal net worth statement for the years 1945–1949 which he subsequently twice amended and which the government claimed, and the jury might have found, was false in almost every material respect. In this statement he included $100,000 of the alleged Rinelli gift of $125,000 as of 1945.

In satisfaction of its burden to establish opening net worth "with reasonable certainty," Holland v. United States, supra, 348 U.S. at page 132, 75 S.Ct. at page 134, the government rebutted the alleged gift with two related lines of proof. It introduced evidence tending to show that Rinelli, who died in 1939, was financially unable to have made such a gift in 1938, and that Sclafani's conduct had been inconsistent with the possession of such a hoard of cash.

Thus the government showed that neither Rinelli nor Sclafani ever filed a gift tax return for the gift and that although Rinelli died in 1939 within a year of the alleged gift, it was not included in his estate tax return; that although in the 1920's Rinelli concededly had considerable wealth, his annual income from 1928 onward was nominal or offset by losses; that the two Rinelli bank accounts found by the government showed small balances and no significant withdrawals from 1934 through 1939; that when Rinelli's once prosperous ship cleaning business was liquidated in 1933 its assets were practically worthless; that his real estate holdings were disposed of partly by gift prior to the alleged gift to Sclafani;

that valuable property operated by Rinelli and held by him subject to a mortgage was taken by foreclosure proceedings in 1935, and that, prior to those proceedings, when the bank offered a low interest rate to allow Rinelli to continue the operation of the property, his reply was to the effect that his financial position prevented him from accepting the offer; that Rinelli mortgaged his home in 1932 for $15,000 at 6% interest and that the mortgage was not paid off at the time of his death; that other property was sold at foreclosure proceedings in 1936; that Rinelli was subject to large deficiency judgments; that a $200,000 insurance trust, which by law was not subject to the claims of his deficiency judgment creditors, was revoked by Rinelli in 1933 "to pay taxes on my different properties" and that substantial loans and interest were first deducted; that Rinelli lived "well" during the depression though he had no apparent source of income after 1929; that Rinelli died less than one year after the alleged gift leaving his widow apparently without substantial funds.

As to Sclafani the evidence showed that he had never claimed to have received such a gift prior to the investigation; that between 1938 and 1945 he borrowed small amounts from banks on several occasions although he claims the alleged gift was then in his possession and through most of the period was uninvested; that, although he said that he had not used the gift in his business because it was a condition of the gift that it not be so used, the only use he now claims to have made of it was in his business after allegedly not having made any substantial use of it at all for about seven years; that he discounted his customers' acceptances at 6% and rediscounted them with banks for 5% to make a 1% profit despite his alleged possession of sufficient cash to handle the discount himself and retain the full 6%; that in summaries of his financial position made to banks for the purpose of securing loans in 1946, 1947 and 1949 the highest amount of cash claimed by Sclafani was under $3,000; that Rinelli did not make similar gifts to other relatives; that the gift was allegedly made secretly and in cash; that it was never at any time banked or invested but was allegedly retained in a closet safe. Moreover no witness was produced to confirm the existence of the money in Sclafani's possession. Indeed the only evidence in support of the gift is that of Sclafani himself.

■ This evidence is sufficient to sustain the government's burden of establishing opening net worth with reasonable certainty. The only lead furnished the government as a possible source of additional net worth on the opening date was the alleged Rinelli gift, and this was exhaustively investigated. Although standing alone it may have constituted a reasonable explanation by the taxpayer inconsistent with his guilt, see Holland v. United States, supra 348 U.S. at page 135, 75 S.Ct. at page 135, on this evidence the jury was justified in finding that the gift was never made.

■ Moreover, the government's evidence was sufficient to prove the crimes even if, as he claimed, Sclafani held a secret hoard of $100,000 in 1945. The increases in net worth independently proved by the government for the subject years were:

| | |
|---|---|
| 1945 | $84,228.42 |
| 1946 | 39,835.08 |
| 1947 | 80,458.07 |
| 1948 | [no demonstrable excess] |
| 1949 | 23,109.27 |

Even if as he claimed Sclafani employed $30,000 of a concealed fund in 1945, and $70,000 in 1947, there remains a substantial unexplained excess of the yearly increases in net worth independently proved by the government and the defendant's own testimony as to his cash and other resources. Such a discrepancy in the defendant's own testimony and financial reports amounting to about $130,000 of unexplained increase in net worth through the prosecution period is highly persuasive of guilt. "There could

hardly be more conclusive independent evidence of the crime. * * * While the evidence as a whole must show a deficiency for each of the prosecution years, the corroborative evidence suffices if it shows a substantial deficiency for the over-all prosecution period." United States v. Calderon, 1954, 348 U.S. 160, 167, 168, 75 S.Ct. 186, 190, 99 L.Ed. 202.

█ (B) As to proof that net worth increases resulted from unreported income, it is well established that the government need not prove the specific source of proved increases in net worth in order to demonstrate their tax character as income; it is sufficient for it to prove "a likely source, from which the jury could reasonably find that the net worth increases sprang." Holland v. United States, supra, 348 U.S. at page 138, 75 S.Ct. at page 136.

The government introduced proof that Joseph L. Sclafani, Inc. was the source of the net worth increases. It showed: (1) that $50,000 of loans made earlier by the corporation to others was repaid to Sclafani personally in 1946; (2) that the corporation paid Sclafani $149,000 by checks payable to him or to cash in 1947; (3) that Sclafani purchased with corporate funds $35,000 worth of securities which he held personally; and (4) that throughout the prosecution period more than $250,000 of corporate funds were commingled with funds in Sclafani's personal accounts. This proof was sufficient to entitle the jury to find that Joseph L. Sclafani, Inc. was the likely source of the net worth increases.

Sclafani apparently does not deny that the jury could have found that he diverted the repayment of corporate loans to himself in 1946. He sought to explain the $149,000 of payments to himself in 1947 by claiming that they were made in return for sums advanced by him to creditors on behalf of the corporation in 1946, but the government produced evidence in the form of bank photostats of corporate checks that $45,577.91 of payments claimed to be of this nature had previously been paid by the corpora-

tion directly to the creditors, and Sclafani failed to produce corporate or personal records adequate to verify his claim that the payments were made by him.

██ The commingling of corporate and personal funds was explained by Sclafani as the product of a check cashing service he rendered in his capacity as salesman for the corporation. He claimed that he cashed the retail customers' checks even when they were in an amount well in excess of the wholesale purchase and that in one way or another the corporation received all receipts properly owing to it. Although it appears that some investigation by the government failed to reveal specific cases of retention by Sclafani in 1949 of corporate receipts commingled with his personal funds, this is by no means fatal to the government's case. Sclafani's misrepresentations on the corporate books and diversions of other corporate funds are sufficient to raise an inference that the books did not accurately reflect the receipts and disbursements of the corporation. Since an inference of the existence of taxable income may be drawn from the proof of increases in net worth greatly in excess of reported income, United States v. Johnson, 1943, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed. 1546, there was sufficient evidence for the jury to find that there was taxable income unreported and that its likely source was Joseph L. Sclafani, Inc.

Moreover, apart from the alleged gift, the taxpayer admitted that he had no other source of non-taxable income, and the government's prolonged investigation, though it revealed assets concealed by the taxpayer, did not disclose any other reasonably likely non-taxable source. United States v. Massei, 1958, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517, holds that as an alternative to proof of a "likely source" for the proved increases in a net worth case the government would succeed "should all possible sources of nontaxable income be negatived * * *"

II—*Search and seizure.* Sclafani contends that the net worth statements and other records, obtained from him after the "routine audit" commenced by Agent Sonkin had been referred to the tax fraud division of the Internal Revenue Service and Special Agent Silbert had begun to participate in the case, were obtained through stealth and deceit, through what had automatically become an unconsented search, and therefore ought to have been suppressed upon his timely motion at trial. We agree with the district court that Sclafani's consent was not procured by stealth or deceit, and that it was sufficient to justify the search the agents made.

The undisputed facts are as follows. On May 26, 1950, Agent Sonkin, in pursuance of his duty (as he testified) "to go out and make audits of returns assigned for investigation" visited the offices of Joseph L. Sclafani, Inc., to make what he truthfully told Sclafani was to be a "routine audit" of the corporation's 1947 income tax return, and received Sclafani's permission to examine the relevant books and records for this purpose. As a result of the subsequent discovery of the discrepancies (discussed, supra) between the corporate books and certain corporate checks, Sonkin had several subsequent conversations with Sclafani, and finally asked him to submit a net worth statement for the years 1945–1949, which Sclafani did about June 22, 1950.

Thereafter, Agent Sonkin's superiors called the investigation to the attention of the tax frauds section of the Intelligence Division, and Silbert was assigned to the case. Silbert's full title is, as he testified, "Special Agent (Criminal Investigator)." On August 18, 1950 Sonkin called Sclafani to make a further appointment, and Sonkin and Silbert visited Sclafani together later that day. According to Sclafani, Sonkin did not disclose on the phone that Silbert would accompany him, and although Sclafani was introduced to "Special Agent Silbert" neither agent informed him as to Silbert's special duties. Silbert asked

Sclafani several questions from a typewritten list he brought with him, and thereafter requested that Sclafani file a new net worth statement, which Sclafani prepared that day.

Sclafani now contends that "[t]he prosecution's case thus establishes that at the time Silbert obtained this data a criminal prosecution was at least a possibility so far as the Bureau was concerned," and that since Sclafani was not notified that the investigation was "no longer routine" his earlier consent was ineffective to authorize the continuance of the search without a warrant.

Sclafani does not deny that all the information he gave to these agents was freely and voluntarily given. He claims, however, that his consent to the searches incident to the investigation was limited to an investigation for "civil" purposes, and that when, without disclosing their altered purpose to him, Agent Sonkin and his superiors brought in a "criminal" investigator, the original consent was exceeded, and the search and seizures were in violation of his rights under the Fourth Amendment.

Several cases appear to have held that the failure to disclose that a once "routine" tax investigation, for which consent was procured, has grown into one to discover whether a crime has been committed, renders the subsequent entries fraudulent and infects the accompanying search. See, e. g., Matter of Bodkin, D.C.E.D.N.Y.1958, 165 F.Supp. 25; United States v. Lipschitz, D.C.E.D. N.Y.1954, 117 F.Supp. 466; United States v. Guerrina, D.C.E.D.Pa.1953, 112 F.Supp. 126. Cf. United States v. Wolrich, D.C.S.D.N.Y.1955, 129 F.Supp. 528. We think that the reliance of these cases on the rule of Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, is misplaced, and that in circumstances such as these the failure to disclose the changing course of the investigation is not fraudulent or deceitful. See Turner v. United States, 4 Cir., 1955, 222 F.2d 926, and cases cited.

A "routine" tax investigation openly commenced as such is devoid of stealth

or deceit because the ordinary taxpayer surely knows that there is inherent in it a warning that the government's agents will pursue evidence of misreporting without regard to the shadowy line between avoidance and evasion, mistake and willful omission.

"Surely defendant was aware that, if a 'routine audit' revealed evidence of criminal liability, the agent would not ignore it merely because he was primarily concerned with civil liability. * * * A statement that the purpose of an investigation is a 'routine audit' is not the equivalent of a promise that only civil liability will be considered regardless of what the examination reveals. Nor would any accountant or businessman so understand it." United States v. Wolrich, D.C.S.D. N.Y.1954, 119 F.Supp. 538, 540 (Dimock, J.).

Moreover it is unrealistic to suggest that the government could or should keep a taxpayer advised as to the direction in which its necessarily fluctuating investigations lead. The burden on the government would be impossible to discharge in fact, and would serve no useful purpose.

The Fourth Amendment does not require more than this, that when his consent is sought the taxpayer be apprised of the government's concern with the accuracy of his reports, and therefore of such hazards as may be incident to a voluntary disclosure. We hold that Sclafani was so apprised by the warning inherent in the request when Agent Sonkin identified himself and disclosed his purpose to audit certain returns of the corporation.

Of course the government's agents may not act so as to obscure the warning inherent in their request for permission to search, as by assuring the taxpayer, in order to quiet his apprehensions, that no proceedings can or even will eventuate, and then rely successfully on the consent so procured. Cf., Shapiro v. United States, 1948, 335 U.S. 1, 68 S.

Ct. 1375, 92 L.Ed. 1787. This is the rule of Gouled v. United States, supra. But no such deception is inherent in Agent Sonkin's concededly truthful description of his purpose as a "routine audit," and nothing appears of record to suggest that the acts of the agents obscured the potential scope of such an inquiry so as to render this description misleading to Sclafani. Since therefore Sclafani's original permission was freely given in response to a fair and accurate warning of the government's concern with his compliance with the tax laws, it sufficed to authorize what followed, and Judge Foley properly denied the motions to suppress.

III—*Grand Jury.* After the information in this case had been filed against Sclafani pursuant to his waiver of indictment, he was summoned as a corporate officer to appear before a Grand Jury investigating the corporation, Joseph L. Sclafani, Inc. in order to produce and identify corporate books and records and to explain the absence or reveal the whereabouts of any such records not produced. Over his objection on grounds of the Fifth Amendment, Sclafani was compelled to comply. Based on these proceedings he now asserts two reasons why his conviction must be reversed. First, he maintains that the proceeding to investigate the corporation was instituted by the United States Attorney solely in order to prepare for trial of the case against him personally, and that therefore certain evidence used at trial which was allegedly procured from him through the Grand Jury should have been suppressed. Second, he maintains that in any event because he was allegedly questioned before the Grand Jury as to personal as well as corporate records his privilege under the Fifth Amendment not to incriminate himself was infringed, as a result of which the information against him should have been dismissed, or at least the evidence allegedly so obtained should have been suppressed.

At the outset this case must be distinguished from cases such as United States v. Lawn, D.C.S.D.N.Y.1953, 115 F.

Supp. 674, and In re Fried, 2 Cir., 1947, 161 F.2d 453, 1 A.L.R.2d 996, in which indictments were quashed because the rights of the defendant had been infringed by the Grand Jury proceedings which gave rise to them. In such cases the defendant's independent interest in not being subject to a public charge of crime which was improperly procured is the basis of reversal. Here, however, the defendant voluntarily surrendered the protection of a Grand Jury proceeding against himself by his waiver of indictment and he does not challenge the fairness of that waiver. The charge of crime having been made in a manner which is concededly proper, a subsequent misuse of Grand Jury proceedings by the United States Attorney, assuming that it was such, could be the basis of a reversal of this conviction only to the extent that the fruits of the abuse were employed in securing it, so as to deprive the defendant of a hearing which comports with the requirements of the due process clause of the Fifth Amendment. See Lawn v. United States, 1958, 355 U. S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321. The only question presented by Sclafani's contentions is therefore whether any evidence used by the government at trial was obtained by it at or through an abuse of the Grand Jury proceeding.

We hold that regardless of the correctness of the defendant's claim of abuse, there is no proof that any evidence used by the government at the trial was obtained by it at or through the Grand Jury proceedings, and consequently there was nothing which ought to have been suppressed.

On July 23 and 26, 1954 subpoenas *duces tecum* and *ad testificandum* were served on Sclafani in his corporate capacity to produce corporate books and records and to testify as to their location if they were not produced. On the return day he refused to testify, claiming his constitutional privilege against self-incrimination, but he was thereafter ordered by Judge Bruchhausen on July 29, 1954 to answer questions relating to the identification and authentication of the books and records of the corporation, which were to be produced pursuant to the subpoena *duces tecum,* and to explain the absence or reveal the whereabouts of those not produced. Sclafani was clearly apprised of the limits of this order both by his counsel in advance of the hearing, and by the United States Attorney who conducted the inquiry before the Grand Jury, and was repeatedly advised to refuse to answer questions which he regarded as having been put to him in his personal capacity.

Subsequent to his compliance with this order Sclafani moved before Judge Rayfiel to dismiss the information previously filed against him on the ground that these events deprived him of constitutional guarantees against self-incrimination and therefore infected the information. Judge Rayfiel denied the motion on the merits of the claimed abuses holding that Sclafani was amply warned of his constitutional rights, and that he "has failed completely to show that his constitutional rights and privileges have been violated or that there was any impropriety in the proceedings leading up to the filing of the information." D.C.S. D.N.Y.1954, 126 F.Supp. 654, 655. During trial the matter was reopened before Judge Foley who, after inspection of the relevant Grand Jury minutes, declined to alter Judge Rayfiel's determination.

Even if we were now to assume both that the government proceeded before the Grand Jury, as Sclafani alleges, in order to prepare for trial of the case against him, and that such use of the Grand Jury was inconsistent with the guarantees implicit in the Federal Rules of Criminal Procedure, rule 1 et seq., 18 U.S.C.A., or the Fifth Amendment, our result would be the same, since no injury resulted from the alleged abuse.

From the trial testimony of Sclafani and the investigating agents, it is clear that the concededly corporate records which Sclafani produced under the Grand Jury subpoena and which he identified as corporate records had been given to

the agents long before the Grand Jury proceedings were undertaken. Sclafani does not now claim that any information as to them was obtained from him through the Grand Jury, or that information so obtained was used at the trial or in preparation for it.

It is similarly uncontested that the allegedly non-corporate records used at trial and with which Sclafani was confronted before the Grand Jury were in the possession of the government long before that proceeding was commenced. Sclafani contends, however, that testimony as to these records was wrongly compelled over his claim of privilege at the Grand Jury and was used against him at trial.

When the records were presented to him at the Grand Jury, Sclafani was cautioned by the United States Attorney that if the records were not corporate records he might claim his privilege against self-incrimination and refuse to identify them. Sclafani nevertheless exclaimed that the records were "personal" and that letters were "addressed to me" and refused to testify further as to them. He now appears to assert that the government made use of this testimony at trial. The opposite appears plainly from the record, however. The government, far from contending that these exhibits were personal records of Sclafani, completely ignored his contention and asserted that they were records of corporate transactions, offering them as a link in the chain of proof that Sclafani had diverted the repayment of certain corporate loans to himself. Therefore even if we assume that Sclafani's claim of privilege was preserved despite his exclamation, see, United States v. Weisman, 2 Cir., 1940, 111 F.2d 260, there is no evidence that his testimony before the Grand Jury affected the conduct of his trial.

Because it thus appears that even if Judge Bruchhausen, by requiring Sclafani to identify corporate records other than those which he himself produced pursuant to the subpoena, improperly overruled his claim of privilege, the error did not affect this conviction, we need not inquire here into the extent to which the corporate record doctrine licenses such compulsion. Cf. Curcio v. United States, 1957, 354 U.S. 118, 125, 77 S.Ct. 1145, 1 L.Ed.2d 1225, and note 4.[2]

■ IV—Sclafani's remaining claims may be disposed of briefly. It is unnecessary to consider at all the claims of error directed to counts four and five, the false statement counts, since the sentences imposed on all counts were equal and concurrent, and since no fine was imposed on count four or five. Lawn v. United States, 1958, 355 U.S. 339, 78 S. Ct. 311, 2 L.Ed.2d 321; Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S. Ct. 1375, 87 L.Ed. 1774; United States v. La Novara, 2 Cir., 1951, 192 F.2d 259.

■ The claim that the trial court's denial of a bill of particulars was erroneous and prejudicial is without support in the record. It appears that the defendant was amply provided with a summary of the government's case and was allowed a reasonable opportunity to examine its exhibits in the course of trial. No such surprise or injury as would justify a holding that the trial court had so abused its discretion as to require reversal of the conviction has been shown, see Wong Tai v. United States, 1927, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545, whereas the appellant's failure to move for a continuance on the ground of surprise is an affirmative indication that in any event it was not prejudicial. Schino v. United States, 9 Cir., 1953, 209 F.2d 67, certiorari denied 1954, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087.

■ Appellant's claims of prejudicial confusion in the trial, which he predicates upon our opinion in United States v. O'Connor, 2 Cir., 1956, 237 F.2d 466, are not supported by the record, and are for the most part restatements of his contention that he was improperly de-

---

2. The same reasoning applies to any violations of the Curcio rule which might have occurred.

nied a bill of particulars. His additional claims that the government introduced a large mass of confusing evidence and exhibits not directly related to the proof of net worth is insubstantial since the evidence pertained primarily to a rebuttal of the defendant's own claim that he had received a substantial cash gift from Rinelli. Cf. United States v. Novick, 2 Cir., 1941, 124 F.2d 107. Finally, the trial court's charge assisted in the clarification of the issues, and was consistent with the criteria we set forth in the O'Connor case.

The conviction is affirmed.