**UNITED STATES of America,**
**Plaintiff,**

v.

**Watson A. YOUNG, Defendant.**
**No. 39577.**

United States District Court
E. D. Michigan, S. D.
Feb. 26, 1963.

 

Lawrence Gubow, U. S. Atty., William H. Merrill, Chief Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Robert Lee Evans, Detroit, Mich. Booker T. Williams, Ypsilanti, Mich., for defendant.

FREEMAN, District Judge.

The defendant, a medical doctor, who stands indicted on 3 counts for willfully and knowingly attempting to evade the payment of a large portion of his income taxes owing for the calendar years 1957, 1958 and 1959, in violation of § 7201, Title 26 U.S.C., has moved to suppress as evidence his books and records for the years 1957 and 1959 and all of his receipt books.

The indictment and defendant's motion arise from the following events. Pursuant to a previously made appointment, Internal Revenue Agent Raymond Gawel called on the defendant at his office on October 6, 1960, to investigate his tax affairs. On that particular visit, Gawel asked for and received certain 1958 and 1959 books and records of defendant, including his 1958 daily log book, a copy of his 1959 tax return, 1958 and 1959 summary books, appointment cards, some checks, etc. On this visit, in response to an inquiry by Gawel, the defendant said that he had no receipt books and did not issue receipts.

Defendant's office building consisted of 5 rooms with a garage attached at the rear. He made available a room used as a kitchenette and his receptionist's office for the use of Agent Gawel on October 6th and also for two subsequent visits on October 13th and 20th, when Gawel was also allowed to further examine defendant's books and records above mentioned.

During Agent Gawel's visit on October 20th, his car was parked in the rear where some children were playing. On this occasion, the office phone rang and Gawel heard a thumping noise, which appeared to be coming from the vicinity of the garage closely adjoining the kitchenette where he was working. Gawel, fearing some tampering with his car by the children, went into the garage to investigate and observed that the thumping noise was coming from the telephone switchboard located in the garage. While he was in the garage and proceeding to return to the kitchenette, Gawel discovered a box containing defendant's receipt books, which he examined and then determined that such receipt books covered the years 1952 to 1959. After Dr. Young had left his office on that date, Gawel ran a tape on the 1958 receipt books and took with him to his office one receipt book and some of the other records. On October 27th, Gawel returned again to defendant's office, and in the absence of the defendant, who was out of the office, replaced the receipt book taken on the previous visit and ran tapes on the 1957 and 1959 receipt books. All of these events relating to the discovery of the receipt books, the running of the tapes, the taking and returning of one of the books, took place without the knowledge or consent of the defendant.

Agent Gawel then suspended his examination and referred the case to the Intelligence Section of the Internal Revenue Service. On December 13, 1960, Special Agent Julius Sigman, accompanied by Agent Gawel, visited the defendant, identified himself as a Special Agent and informed defendant that they were interested in violations of the Internal Revenue Code, that Gawel had referred the case to him, and that there were certain discrepancies he wanted to check. At that time, Sigman warned the defendant "that he did not have to give me or say anything to me," and then requested and received from the defendant daily books for 1958 and 1959, summaries of daily books for 1957, 1958 and 1959, miscellaneous expense data, cancelled checks, monthly statements of two

accounts, a business account for 1958 and 1959, and an econo-check account for 1958. At this December 13th meeting with the defendant, Agent Sigman asked him whether he had any receipt books, to which the defendant replied that he didn't and that it was not until January, 1960, that an accountant and an insurance man had helped him to install a receipt system.

On December 22, 1960, Agent Sigman returned the material the defendant had given him at the previous meeting and asked the defendant "why he had denied the existence of receipt books, because we knew he had receipt books." The defendant replied that he had misunderstood Sigman if he had asked for such books and he did not remember being asked about them, whereupon Sigman again requested the receipt books, and defendant then went to the garage and brought out the receipt books in a box, which he turned over to Sigman, who again reminded defendant that he was a Special Agent, and in response, the defendant said that he so understood and wanted to "clean the thing up the best way possible."

Defendant's motion to suppress involves (1) all books and records for 1957 and 1959, and (2) the receipt books which were in the garage.

In support of his motion, defendant contends that such evidence was illegally seized and is inadmissible because (1) the Government concealed from defendant that Special Agent Sigman was making a criminal investigation, which constituted a fraud upon defendant; (2) that there was more than one investigation of defendant's books for the year 1957 before defendant was notified that an additional inspection was necessary, which was in violation of 26 U.S.C. § 7605; and (3) that the discovery and use of defendant's receipt books was illegal under the Fourth and Fifth Amendments to the Constitution.

■■ The fact that the Government fails to disclose that the investigation of a taxpayer is changing from a civil to a criminal inquiry does not constitute fraud or deceit upon such taxpayer. United States v. Sclafani (C.A. 2), 265 F.2d 408; Turner v. United States (C.A. 4), 222 F.2d 926; United States v. Burdick (C.A. 3), 214 F.2d 768; Montgomery v. United States (C.A. 5), 203 F.2d 887; Hanson v. United States (C.A. 8), 186 F.2d 61; United States v. Wolrich (D.C. S.D.N.Y.), 119 F.Supp 538. A statement that the purpose of the investigation is a routine audit is not the equivalent of a promise that only civil liability will be considered regardless of what the examination reveals. United States v. Wolrich, supra; United States v. Sclafani, supra; Turner v. United States, supra.

■ However, the Government's agents may not act so as to obscure the warning inherent in their request for permission to search, as by assuring the taxpayer in order to quiet his apprehensions that no proceeding can or ever will eventuate, and then rely successfully on the consent so procured. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647. See also Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787.

Since the Government, in the instant case, did not assure the defendant that there would be no criminal prosecution, there was no fraud or deceit practiced upon the taxpayer in violation of his Constitutional or statutory rights.

26 U.S.C. § 7605(b) provides:

*"Restrictions on examination of taxpayer.*—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

■ A taxpayer waives any rights he may have under § 7605(b) with re-

spect to a limitation of only one inspection of his books of account for a certain taxable year, if he consents to a reinspection of such books and records. United States v. O'Connor (C.A. 2), 237 F.2d 466; Glassell v. Commissioner of Internal Revenue (C.C.A. 5), 42 F.2d 653; Reineman v. United States (C.A. 7), 301 F.2d 267.

█ With respect to the books and records for 1957 and 1959, exclusive of the receipt books, defendant's motion is without merit. The testimony clearly indicates that the defendant freely and voluntarily turned over such books and records. Under these circumstances, the procurement and use of such records did not come about as the result of any illegal search of unlawful activity by the Government agents. Also see Benes v. Canary (C.A. 6), 224 F.2d 470.

█ The search and seizure of defendant's receipt books poses a different problem. The Government admits, and this Court finds, that Dr. Young did not give Agent Gawel permission to be in the garage or to examine the receipt books stored therein, and that Gawel did not have a search warrant. Indeed, the Government concedes that the discovery of the receipt books in the garage by Agent Gawel exceeded legal authority and was invalid. However, the Government argues that when Dr. Young was confronted by Special Agent Sigman with the fact that the agents knew of the existence of the receipt books and, upon request, voluntarily turned them over to the agents, defendant waived his rights under the Fourth Amendment with respect to the initial illegal search.

The parties have cited no authority covering this precise situation. Independent research of the Court has found only one case involving this same problem. In Mosco v. United States (C.A. 9, 1962), 301 F.2d 180, an officer conducted an illegal search of defendant's car and found incriminating evidence, which he replaced. Subsequently, the officers made a legal arrest of the defendant and received his consent[1] to search his automobile. The Court held that the incriminating material found in the car was inadmissible as evidence and at p. 188 of its opinion said:

"As to Exhibit A, the established facts are that the search was made before any consent (however liberally construed) was obtained, and the purported 'request' for Mosco's consent was pure sham. In our opinion the clear-cut violation of Mosco's Fourth Amendment rights, accomplished when Sage first searched the automobile without consent, cannot be cured by such a device."

The fact that the agents told Dr. Young that they knew of the existence of the receipt books and did not merely ask for permission to search the garage does not distinguish the instant case. If anything, this use of the ill-gotten knowledge is more reprehensible, since the agents used it as a lever to spring consent. In Mosco, it might have been argued that in all probability the Government would have learned of the evidence secreted in defendant's car, since the officers would have searched the car as a matter of course after having arrested him, and under the Court's ruling, such a search would have been incident to the lawful arrest of defendant.[2] However, in the case at bar, the Government would not have learned of the existence of the receipt books absent the unlawful search.

The analogous case of Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, sets forth the controlling principle on this issue. In that case, the Government attempted to subpoena certain papers for

[1.] The Court expressly found (p. 184) that "Mosco *consented* (though he disclaimed consent at his trial)."

2. At page 186 of the opinion, the Court held that the search of the defendant's automobile was reasonable in the sense it extended only to an area over which Mosco "exercised dominion and control."

a grand jury hearing which had been illegally seized and returned to the defendants. The Court held that the Government could not subpoena the papers involved and Mr. Justice Holmes, in commenting on the scope of the Fourth Amendment, stated at page 392, 40 S.Ct. at page 183:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court, *but that it shall not be used at all.* Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an *independent source* they may be proved like any others * * *." (Emphasis supplied).

The Government should not be allowed to make illegal searches and then use the information it thereby discovers as a wedge for prying incriminating evidence out of the citizenry. Such a result would succeed in making a sham of the Fourth Amendment and not be in keeping with the mandate of the Supreme Court and the Court of Appeals for the Sixth Circuit that the Fourth Amendment should be liberally construed. See Catalanotte v. United States (C.A. 6, 1953), 208 F.2d 264, at page 267, where Judge Martin, speaking for the Court, stated:

> "As declared by the Supreme Court in Grau v. United States, 287 U.S. 124, 128, 53 S.Ct. 38, 40, 77 L.Ed. 212, * * * the guaranties of the Fourth Amendment are to be liberally construed 'to prevent impairment of the protection extended.' * * * In the Gouled case, supra, 255 U.S. at page 304, 41 S.Ct. at page 263, 65 L.Ed. 647, * * * the Supreme Court said: 'It has been repeatedly decided that these amendments [the Fourth and the Fifth] should receive a liberal construction, so as to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by them, by imperceptible practice of courts or

by well-intentioned, but mistakenly overzealous, executive officers.' "

Therefore, this Court concludes that the defendant's motion must be denied as to the 1957 and 1959 books and records and granted as to the receipt books. An appropriate order may be submitted.