**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**George Y. STRIBLING, Defendant-
Appellee.**

**No. 20453.**

United States Court of Appeals,
Sixth Circuit.

Feb. 10, 1971.

Richard B. Buhrman, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellant; Johnnie M. Walters, Asst. Atty. Gen., Joseph M. Howard, Atty., Dept. of Justice, Washington, D. C., on brief.

Ron Tonidandel, Cleveland, Ohio, for defendant-appellee; Lawrence I. Byrnes, Phillip J. Campanella, Cleveland, Ohio, on brief; Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, of counsel.

Before WEICK and CELEBREZZE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

The Government has appealed from a suppression order entered by the District Court in a criminal tax case. The appeal was taken under the authority of 18 U.S.C. § 3731, as amended by Title VIII of the Omnibus Crime Control Act of 1968.

A three-count indictment was returned against Stribling in the United States District Court for the Western District of Washington, Southern Division, on March 9, 1966, charging him with evasion of income taxes in the amount of $35,300.10, for the years 1959, 1960 and 1961. On April 21, 1966, on his motion, the District Court transferred the case to the United States Dis-

trict Court for the Northern District of Ohio, Eastern Division, in which Division Stribling resided.

Stribling filed a motion to suppress evidence, which motion was granted by the Court. We reverse.

Stribling was engaged in the business of training, buying and selling horses which he raced and on which he bet, at various race tracks throughout the country. He also trained jockeys, entered into contracts with them, and sold their contracts.

In the latter part of December, 1962, IRS commenced a full scale investigation of a jockey who rode for Stribling, for failure to file income tax returns for 1959, 1960 and 1961.[1] Special Agent Hunter, of Louisville, Kentucky, who conducted the investigation, interviewed the jockey and learned that he had been living on Stribling's farm in Mechanicstown, Carroll County, Ohio, since late in 1957; that from the time he started riding for Stribling he turned over to Stribling almost every dime of his earnings except for a few living expenses; that these funds were handled for him by Stribling, who deposited them in a trust fund which he could withdraw only with Stribling's consent until he reached the age of 21 years; and that he was under contract with Stribling. Hunter was of the opinion that he (Hunter) could not make a proper investigation of the jockey without interviewing Stribling.

Hunter sent collateral requests to the Cleveland Field Office of the Intelligence Division and to other Districts, requesting information about the jockey. The request to Cleveland was assigned to Special Agent Auerbach, who requisitioned all tax returns filed by Stribling in the Cleveland District. The requisition came back, marked "No Returns". Auerbach was interested in Stribling because of his close relationship with the jockey. Auerbach reported to Hunter that he could not locate Stribling's tax

returns for the years 1960 and 1961, and asked Hunter to determine where Stribling had filed his returns for those years.

On March 20, 1963, Hunter went to Stribling's farm at Mechanicstown, Ohio, and, in Stribling's absence, left a summons requiring him to appear at the office of the Intelligence Division in Canton, Ohio, on April 15, 1963. Attached to the summons was a note requesting Stribling to call Hunter at his earliest convenience. Stribling telephoned Hunter from Providence, Rhode Island, where he was racing, and an arrangement was made for Hunter to fly there to meet him on March 28.

At that meeting Hunter told Stribling that he was requested to answer questions about the jockey, and that Stribling had a right to refuse to answer any questions which might tend to incriminate him. He was not advised that he was under investigation by IRS or that he had a right to have an attorney. He was interrogated, and signed a written statement about the jockey. Stribling was also asked whether he had filed income tax returns for the years 1959, 1960 and 1961. His answer was that he had filed returns for those years in the state of Washington.

Several months after the Hunter interview, Stribling consulted Stewart O. McHenry and Edgar Jones, attorneys at law, of the law firm of Amerman, Burt, Shadrach, McHenry and Jones, of Canton, Ohio. Upon their recommendation, Ronald Graves, an accountant, was employed to prepare amended income tax returns and a net worth statement of Stribling. Graves was a former Internal Revenue agent in the Canton Audit Division. The amended returns and net worth statement were prepared and delivered by Attorneys McHenry and Jones to Agent Beal of the Canton Audit Division, together with a letter of transmittal.[2] The returns were assigned

---

1. The jockey's name was not made a part of the record, at the request of the Government.

2. Attorney McHenry, who testified at the hearing on the motion to suppress, did not say why he left the returns with

for routine audit to Internal Revenue Agent George Kast on October 23, 1963, by Mr. Brownfield, his superior in the Canton Audit Division.

Counsel for Stribling, in his brief, states the reason why Stribling consulted counsel and an accountant:

"In the meantime, following up on conversations he had had beginning in late 1962 and continuing into the spring of 1963 with a close friend of his in California whom he had known for many years, Stribling consulted an Ohio attorney, Stewart McHenry. Stribling had been under the impression that winnings from bets or proceeds from the sale of horses did not have to be reported as long as they were reinvested in his horse-racing business. It was in talking to his California friend that it first came to Stribling's attention that he may not have been reporting income properly on his tax returns. After Stribling consulted attorney McHenry, it was determined that an accountant (Graves) would be employed to inspect Mr. Stribling's records, reconstruct his income as best they could, and prepare amended returns." (Brief at 7)

In answer to questions propounded by the Court, Attorney McHenry testified:

"Q Before you get further into the subject matter, did you have any conference with Mr. Stribling, either alone or in the presence of other persons, concerning his answering questions put to him by Mr. Kast or his right to refuse to answer questions?

"A No, your Honor. That was never discussed, because we took the position that amended returns should be filed and a forthright, open discussion should be had regarding anything that related to those returns. And by 'we,' I mean Mr. Jones and myself.

"Q Did you then advise Mr. Stribling to answer any questions that were put to him?

"A Yes. We encouraged him to answer everything.

"Q And on that general subject—incidentally, would that have occurred that same day or some prior date?

"A You mean our advice to answer anything?

"Q Yes. Yes.

"A From the time that Mr. Kast first appeared upon the scene.

"We likewise had encouraged Mr. Stribling to be as cooperative and as forthright and draw upon his memory, do everything he could to help Mr. Bruner and Mr. Graves reconstruct his income and prepare his returns." (App. 296)

Mr. McHenry elaborated further in response to questions asked by Government counsel:

"Maybe the advice that we had given him, the way to proceed here was—maybe it was bad advice. But it was the best advice that we knew how to give him. By 'we,' Mr. Jones and I, with whom I was in perfect accord.

"I thought the best way to do this thing—this is the country lawyer approach. I thought the best thing to do was to be as absolutely cooperative and as open and free with every bit of information and not to withhold anything from the Department. I took the position that the Department wanted to be informed and that they had the right to be informed, and with all due respect to Mr. Stribling, I thought that was the best advice that I could give him." (App. 301)

Agent Kast commenced his audit about November 1. He contacted Stribling and told him that he (Kast) was assigned to the case and would like to meet with him and his representatives.

the Audit Division in Canton instead of filing them with the District Director of Internal Revenue in the Cleveland District, where the taxpayer resided, as required by Treasury Regulations § 1.6091–2 (1959).

Stribling referred Kast to his attorney, Mr. McHenry.

On November 19, Kast met with Stribling, McHenry and Graves at Stribling's farm. Kast testified that he presented his credentials and that Stribling was "aware" that he was making an examination of Stribling's tax returns.[3] During this interview and during another one which took place on December 27, 1963, Stribling made incriminating statements, and he and his representatives turned over to Kast incriminating documents. Kast did not advise Stribling of the possibility of criminal prosecution or of his constitutional rights. Stribling was represented by counsel at all of the conferences except one, which was an afternoon continuation of a morning session. It is not claimed that any incriminating statements were made during that afternoon.

Kast testified that he did not know of the investigation of Stribling by Special Agents of the Intelligence Division, which commenced in January, 1963. The Court in his oral opinion stated: "* * * I believe [Kast] did not know * * *." On February 20, 1964, Kast referred the case to the Intelligence Division for possible criminal investigation. Kast did not learn that the Intelligence Division had been investigating Stribling until Special Agent Auerbach called him on the telephone on March 4, 1964.

The evidentiary hearing conducted by the District Judge commenced on March 20, 1970, and ended on April 3, 1970. The transcript contains 596 pages; 71 numbered exhibits, consisting mostly of documents, papers and records taken from the files of the Intelligence and Auditing Divisions, were received in evidence. There is no question but that the District Judge gave careful and conscientious consideration to the case. At the conclusion of the evidence the Court dictated into the record an oral opinion which contained his findings and conclusions.

First, the Court ordered the Hunter interview suppressed. This interview concerned the jockey; the only portion thereof relating to Stribling was that part when he disclosed, in response to a question, the fact that he had filed his income tax returns in the state of Washington. As to this, the Court in its opinion stated:

"The filing of the amended returns on August 23, 1963 brought about several results. It now supplied the Internal Revenue Service with information as to where he had filed his income tax returns in the years 1955 through 1962.

"Hence, whatever leads, if any, that may have flowed from the improper eliciting of the same information from George Y. Stribling in the Hunter interview now certainly ceased." (App. 332)

 The Government in its appeal does not question this action taken by the District Court. Hence, we see no point in discussing it further, although Stribling in his brief makes a big issue of it.[4]

---

3. Stribling testified that Kast told him that his investigation was to determine the correctness of his amended returns from 1959 to 1962. The Court credited Stribling's testimony in this respect. We think it is clear that without it Stribling also was "aware" of this fact, as Kast testified, because Stribling knew that his attorneys had left the amended returns and the net worth statement with the Canton Audit Division. He could hardly expect that the Audit Division would accept his amended returns without an investigation into their correctness. In any event, if Kast made the statement, it was unquestionably true.

4. Stribling, in his brief, even argues that the Kast audit was merely a continuation of the investigation by Special Agents Hunter and Auerbach. This is not true as it was the voluntary act of Stribling, his lawyer McHenry and his accountant Graves, in filing the amended returns and net worth statement with the Canton Audit Division, that brought Kast into the case.

Second, the Court ordered suppressed—

" * * * all admissions made to Agent Kast orally or in writing by Mr. Stribling or his agents with his authority and consent and all documentary records that were produced by the defendant and made available by him or his agents to Revenue Agent Kast." (App. 338)

It is this part of the order which the Government in its appeal contends is erroneous. It was the theory of the District Court that the Government should have disclosed to Stribling the facts that the Intelligence Division was investigating him, and that a criminal prosecution might result therefrom; and that Agent Kast, who was making the audit, misled Stribling and his attorney.

In his oral opinion the Court found:

"On this record, it is found and determined that both Mr. Stribling and his counsel were misled by Mr. Kast and were lulled into believing that the disclosures being made would be used solely to determine the correctness of his amended returns. In the words of White, supra, they were affirmatively misled into believing that the investigation was exclusively civil in character and would not lead to criminal charges." (App. 337)

■ In our opinion, this finding is not supported by substantial evidence and is clearly erroneous. It is contradicted by a subsequent finding that Agent Kast did not even know of the investigation by the Intelligence Division. The "misleading", so-called, was the alleged statement made by Agent Kast to Stribling, his lawyer and accountant, of a fact which they already knew, namely, that he (Kast) had been assigned to make an investigation of the correctness of the amended returns. Such a statement, if made, was true.

Kast did not misrepresent anything to Stribling, his lawyer or his accountant, and did nothing to mislead them. During the interviews conducted by Agent Kast, the latter could not very well advise Stribling, his attorney and accountant, that the Intelligence Division was conducting an investigation, because Kast had no knowledge of that fact. Kast made them no promises. There was nothing coercive in anything which Kast did or said. The entire investigation was conducted without rancor or threats, but rather, in a friendly atmosphere, in the presence of Stribling's lawyer and accountant. Agent Kast cannot be blamed for the decision which Stribling, his lawyer and accountant voluntarily made in July, 1963, to make a clean breast of everything, to file amended returns and a net worth statement, and to co-operate with the Government in determining the correctness of the amended returns, obviously in the hope that no criminal prosecution would result. Kast was not assigned to investigate the amended returns until October 23, 1963, and had never heard of the case until after the amended returns were filed.

It is not claimed that anyone connected with the Government had anything to do with the decision made by Stribling and his representatives to file amended returns and to make a clean breast of everything.

Nor can the Government be blamed if Stribling neglected to tell his lawyer and accountant about the Hunter interview. Stribling testified on cross-examination that he did inform Mr. McHenry as to the Hunter interview:

"Q Now, Mr. Stribling, you testified that Mr. McHenry did not advise you of your rights.

"Had you informed Mr. McHenry that you had been interviewed by Mr. Hunter?

"A Yes.

"Q And did you have any extensive conversations with Mr. McHenry as to the nature of your interview by Mr. Hunter?

"A Yes.

"Q And did you advise Mr. McHenry that Special Agent Hunter asked you whether or not you personally had filed income tax returns?

"A I don't recall. I don't recall.

"Q You don't recall.

"Do you remember Mr. Hunter asking you whether or not you had filed?

"A Yes.

"Q I see. And do you remember your answer to his question of whether or not you filed income tax returns?

"A Yes.

"Q And what was that answer?

"A That I had filed my income tax in the State of Washington.

"Q I see. Do you recall whether or not you advised Mr. McHenry that you told Mr. Hunter that you had filed income tax returns in the State of Washington?

"A I don't recall that." (App. 285–286)

McHenry, when questioned as to whether Stribling advised him of the Hunter interview, testified, "No, I don't believe so."

It does seem to be quite a coincidence that it was not until after the Hunter interview that Stribling consulted counsel and decided to file amended returns and a net worth statement, and to make a clean breast of everything. We are cognizant of Stribling's contention that he was motivated by advice given to him by his California friend (rather than what took place at the interview with Special Agent Hunter), to engage an attorney and accountant and to file amended returns and a net worth statement. In any event, if Stribling chose not to advise his attorneys and accountant of the Hunter interview, he can fault no one except himself for that decision.

▮ It is argued on appeal that Agent Kast should have advised Stribling of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), to remain silent, to furnish no documents, papers or records, and to have counsel. The fact is that it was unnecessary to advise Stribling of his right to counsel because he had already employed counsel and an accountant, both of whom were present at the interviews. Agent Kast was not required to assume that the attorney and accountant representing Stribling did not properly advise him of his rights, or that they did not intend to do what they did.

An Internal Revenue Agent assigned to make a routine audit ought to be circumspect in interviewing a taxpayer. The agent should not assume that such a taxpayer has cheated the Government and offend him by warning him as to the possibility of criminal prosecution and advising him as to his constitutional rights.

▮ Reliance on *Miranda* is misplaced as its guidelines were limited to in-custody interrogations. This was made clear in Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), which applied *Miranda* to an interrogation by a Revenue Agent of a prisoner in state custody.

▮ Stribling was never in custody and any information which he or his attorney and accountant divulged to Agent Kast was wholly voluntary. In the absence of fraud or misrepresentation, statements obtained by Special Agents are admissible. Muse v. United States, 405 F.2d 40 (8th Cir. 1968), cert. denied, 393 U.S. 1117, 89 S.Ct. 992, 22 L. Ed.2d 122 (1969); Cohen v. United States, 405 F.2d 34 (8th Cir. 1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969); White v. United States, 395 F.2d 170 (8th Cir. 1968); cf. United States v. Sclafani, 265 F.2d 408 (2d Cir.), cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959).

All Circuits, except the Seventh,[5] have held *Miranda* inapplicable to tax investi-

5. United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969). The Court limited its decision prospectively only to admissions made and documents turned over after the date of the opinion.

gations conducted either by a Special Agent or by an Agent employed in the Auditing Division where the taxpayer is not in custody.

The cases are collected in our recent opinion in United States v. Miriani, 422 F.2d 150, 153–154 (6th Cir. 1970), cert. denied, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970), and in opinions of the Third and Fifth Circuits, in United States v. Jaskiewicz, 433 F.2d 415 (3d Cir., decided Sept. 28, 1970), and in United States v. Prudden, 424 F.2d 1021 (5th Cir. 1970). See also United States v. Maius, 378 F.2d 716, 718–719 (6th Cir.), cert. denied, 389 U.S. 905, 88 S.Ct. 216, 19 L.Ed.2d 219 (1967); Biggs v. United States, 246 F.2d 40 (6th Cir. 1957), cert. denied, 355 U.S. 922, 78 S.Ct. 364, 2 L.Ed.2d 353 (1958).

In *Miriani* we said:

"The defendant was never in custody when being interrogated by the agents of the Internal Revenue Service. Where a person is not under arrest or under duress in the legal sense of the term, it is not necessary to the admission of his statements in evidence that he be warned of his constitutional rights by the agents interviewing him * * * [Citing authority] And this is true even when the examination for the purpose of determining civil tax liability takes on criminal aspects." [Citing authority] 422 F.2d at 153, 154.

As was well stated in *Jaskiewicz, supra:*

"There was no affirmative duty on the part of the Government to disclose to appellant the extent and nature of its investigation. Hoffa v. United States, 385 U.S. 293, 303 [, 87 S.Ct. 408, 17 L.Ed.2d 374] (1966); Lewis v. United States, 385 U.S. 206, 209, [87 S.Ct. 424, 17 L.Ed.2d 312] (1966)."

In United States v. Sclafani, 265 F.2d 408 (2d Cir. 1959), the panel which was comprised of Circuit Judges Medina, Lumbard and Burger,[6] held:

"The Fourth Amendment does not require more than this, that when his consent is sought the taxpayer be apprised of the government's concern with the accuracy of his reports, and therefore of such hazards as may be incident to a voluntary disclosure. We hold that Sclafani was so apprised by the warning inherent in the request when Agent Sonkin identified himself and disclosed his purpose to audit certain returns of the corporation." *Id.* at 415.

In *Prudden, supra,* the Court said:

"Prudden points to the failure of Special Agent Cohen to tell him that his function was to investigate for criminal fraud. All Cohen was required to do by the then existing Internal Revenue Service requirements was to tell Prudden that he was a Special Agent and show Prudden his credentials. This he did. He in no way concealed his true identity. He could not have affirmatively mislead Prudden as to the function of the Intelligence Division or as to the duties of a special agent, since neither of these subjects were ever discussed. Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading. None of these factors were present here." 424 F.2d at 1032.

In United States v. Squeri, 398 F.2d 785, 788 (2d Cir. 1968), the Court said:

" * * * [T]he information that a taxpayer's returns are under audit gives notice of the possibility of criminal prosecution regardless of whether the agents contemplate civil or criminal action when they speak to him."

See also Spahr v. United States, 409 F.2d 1303, 1306 (9th Cir.), cert. denied, 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969).

---

6. Sitting by designation.

On the face of each income tax return filed by Stribling in Washington, in which he did not report all of his income, was the warning:

"Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief it is true, correct and complete."

The District Court, in its opinion, stated:

"Defendant relied principally to support this branch of their motion on United States v. Lipshitz, 132 Federal Supplement 519, Eastern District of New York, 1955; U. S. v. Wheeler, 149 Federal Supplement 445, although this case was reversed on other grounds by the Third Circuit; and United States v. Guerrina, 112 Federal Supplement [126] 127, Eastern District of Pennsylvania, 1953." (App. 336)

The same authorities were relied on by Stribling here. The trouble with these authorities is: *Lipshitz* was overruled by the Court of Appeals of the Second Circuit in *Sclafani*, 265 F.2d 408, cert. denied 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959).[7] *Guerrina* was later revised on application for rehearing, 126 F.Supp. 609, 610, 611 (1955). *Wheeler*, 256 F.2d 745 (3d Cir. 1958), not only reversed the decision of the District Court, but vacated the suppression order.

Thus the contentions of Stribling were not supported by authority. They are in conflict with decisions of this Court in *Mariani, Maius* and *Biggs*.[8]

■ Stribling and his attorney McHenry testified that if they had known of the investigation conducted by the Special Agents, they would not have furnished any information to Agent Kast. These self-serving statements, made long after the investigations had been completed, do not militate against the rule that the Government owed them no duty to inform them of the nature and extent of its investigation.

■ The fact that an investigation was conducted by Special Agents does not mean that it is limited to a criminal tax investigation. One reason for the investigaion may be for the purpose of determining tax liability. Not all investigations by Special Agents result in criminal prosecutions.

Recently we upheld the validity of summons issued by Special Agents under 26 U.S.C. § 7602 for the dual purpose of determining tax liability and investigation of possible tax fraud. United States v. Held, 435 F.2d 1361 (6th Cir. decided December 17, 1970); United States v. Artman, 435 F.2d 1375 (6th Cir. decided Dec. 17, 1970).

The order of suppression is vacated in the respects stated in the opinion.

CELEBREZZE, Circuit Judge (dissenting).

I would affirm the District Court's order suppressing all information gleaned by the United States as a result of its interviews between Agent Kast and the Appellee.

It is well established that agents of the Internal Revenue Service may not use fraud, trickery or deceit to obtain consent to examine documents or conduct a search. Such actions would vitiate the voluntary character of any evidence gained through such tactics. Gouled v. United States, 255 U.S. 298, 304–305, 41 S.Ct. 261, 65 L.Ed. 647 (1921). This rule has been affirmed in

---

7. We think the Court actually intended to overrule the decision of the District Court reported in 132 F.Supp. 519, which ordered suppression, rather than 117 F.Supp. 466, which merely granted a hearing on the motion to suppress.

8. The dissenting opinion likewise does not comport with the rule in these cases. It would place a duty on the part of the Government to advise a taxpayer of an investigation by Special Agents and the nature and extent thereof. It equates failure to so advise with fraud, misrepresentation and trickery.

recent cases by the United States Courts of Appeals from the Second, Fifth, Eighth and Ninth Circuits. *See,* United States v. Sclafani, 265 F.2d 408, 414 (2d Cir.) cert. den. 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959); United States v. Prudden, 424 F.2d 1021, 1032, 1033 (5th Cir. 1970); Cohen v. United States, 405 F.2d 34, 40 (8th Cir. 1968) cert. den. 394 U.S. 943, 89 S.Ct. 1274, 22 L.Ed.2d 478 (1969); Spahr v. United States, 409 F.2d 1303, 1306 (9th Cir.) cert. den. 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969). This Court has also acknowledged the validity of the rule enunciated down in *Gouled* that incriminating evidence is not admissible if obtained under a promise of immunity or through fraud or misrepresentation on the part of the Government. We held:

"It is settled law that the privilege against self-incrimination does not preclude the admission into evidence of documents voluntarily given to a revenue agent in a civil tax investigation without promise of immunity and in the absence of fraud or misrepresentation, even though the taxpayer did not anticipate criminal prosecution. [Cites omitted]

"Whether the books were voluntarily surrendered by the Appellant or were obtained under a promise of immunity or through fraud or misrepresentation on the part of the Government is a question of fact." 246 F.2d at 44.

I believe that based upon the facts of this case, there is clear and convincing evidence to support the District Court's factual finding that the Appellee "and his counsel were misled by Mr. Kast and were lulled into believing that the disclosures being made would be used solely to determine the correctness of [Appellee's] * * * amended returns." (Appendix at 337).

In February, 1963, the Intelligence Division of the Internal Revenue Service began an investigation of the Appellee with a view toward determining whether or not he should be criminally prosecuted for violations of the Internal Revenue Code. Under compulsion of a summons which was issued pursuant to 26 U.S.C. § 7602 (1964) and which purportedly concerned an employee of the Appellee, the Internal Revenue Service sent out a Special Agent to interview the Appellee. That interview which took place in March, 1963, set off a chain of investigations of the Appellee's activities in Chicago, Illinois, Seattle, Washington, Cincinnati, Ohio and Kentucky. By late August, 1963, the Internal Revenue Service Assistant Regional Commissioner in Cincinnati, whose jurisdiction covers a five state area including all of Kentucky and Ohio, was sent a report on the Internal Revenue Service's widespread investigation of Appellee's activities. While this investigation was taking place, the Appellee filed amended returns.

In response to the filing of Appellee's amended returns, the Canton office of the Internal Revenue Service sought to requisition the Appellee's tax returns and was informed that the material requested was in the hands of a Special Agent of the Intelligence Division for the past several months. There is no indication in the record that the Canton office made any further inquiry as to the status of the Intelligence Division's investigation into the Appellee's affairs. Indeed, the Canton office did not even inquire to its Regional Office in Cincinnati concerning the status of the Internal Revenue Service's investigation on the Appellee. Had the Canton office followed up on this matter, they would have been made aware of the multistate investigation for tax fraud which the Intelligence Division was pursuing. Instead, the Canton office ordered Agent Kast to interview the Appellee with respect to his amended tax returns for the years 1959–62.

Agent Kast met with the Appellee and his tax lawyers several times in November and December, 1963 and affirmatively represented to the Appellee that his purpose in conducting those interviews was to determine the correctness

of Appellee's *amended* returns for the years 1959–62. Agent Kast did not express any intention to audit Appellee's *original* returns or to gain facts which might be used against the Appellee in a criminal prosecution based on his *original* returns. While Agent Kast may have believed his statements to the Appellee were true because his own superiors did not inform him of the continuing criminal investigation, there can be no question these affirmative statements misrepresented the position of the Internal Revenue Service with regard to the Appellee. The Appellee testified under oath that he would never have volunteered the records or information he provided Agent Kast had he known such information could have been used against him in a criminal prosecution or had he known that the Internal Revenue Service had begun investigating the possibility of a criminal indictment based on his *original* returns several months before the Kast interviews. Appellee testified he offered the records and volunteered the information he gave so that the Internal Revenue Service could fairly determine the accuracy of his *amended* returns as Agent Kast had indicated to him was the purpose of his visit.

I believe the record in this case provides "clear and convincing" evidence to support the District Court's finding that the Appellee and his counsel were affirmatively misled and deceived into believing that the Internal Revenue Service's purpose in seeking information was in the pursuit of an exclusively civil investigation which would not lead to criminal charges. The majority concedes that Agent Kast affirmatively represented to the Appellee that the limited purpose of his audit and interviews was to determine the correctness of Appellee's amended returns. Those statements by Agent Kast served to affirmatively mislead the Appellee into volunteering information which he would not otherwise have given. The fact that Agent Kast was not informed by his immediate superiors at the Canton Field Office or by his superiors in the Cleveland District Office or in the Cincinnati Regional Office that a continuing nationwide criminal investigation of Appellee had been in progress for a period of several months cannot be used as a shield if in fact his misleading statements deceived the Appellee. The District Court so found. An agent of a field office of the Internal Revenue Service must be held answerable for information which his immediate superiors should have discovered and which his district and regional offices clearly possessed. The District Court's order suppressing all evidence gleaned by the Internal Revenue Service from the Kast interviews should be affirmed.